Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>v.<br><br>ALBERTO ORTEGA VÁZQUEZ<br><br>Apelante | KLAN202200243 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso número: D VI2019G0005<br><br>Sobre: Art. 93 |
|---|---|---|

Panel integrado por su presidenta, la juez Domínguez Irizarry, el juez Salgado Schwarz y la juez Aldebol Mora.

Aldebol Mora, Juez Ponente

# SENTENCIA

En San Juan, Puerto Rico, a 6 de diciembre de 2024.

Comparece ante nos la parte apelante, Alberto Ortega Vázquez, mediante el recurso de epígrafe, y nos solicita que revoquemos las sentencias dictadas en su contra por el Tribunal de Primera Instancia, Sala Superior de Bayamón, el 8 de diciembre de 2021. Mediante dichos dictámenes, el foro primario condenó al apelante a cumplir ciento cuarenta y cuatro (144) años de cárcel por todos los cargos que pesaban en su contra.

Por los fundamentos que exponemos a continuación, se confirman las *Sentencias* apeladas. Veamos.

## I

Por hechos ocurridos el 26 de septiembre de 2018, el Ministerio Público presentó acusaciones en contra de Alberto Ortega Vázquez (Ortega Vázquez o apelante) por la alegada comisión de los siguientes delitos: un (1) cargo por asesinato en primer grado, según tipificado en el Artículo 93 (a) del Código Penal de Puerto Rico de 2012, 33 LPRA sec. 5142 (Código Penal de 2012); cinco (5) cargos por tentativa de asesinato, según tipificado en el Artículo 93 (a) del

Código Penal de 2012, *supra*; un (1) cargo por la portación y el uso de armas de fuego sin licencia, según lo tipifica el Artículo 5.04 de la Ley Núm. 404-2000, según enmendada, conocida como la *Ley de Armas de Puerto Rico*, 25 LPRA sec. 458c (derogada) (Ley de Armas de 2000); y siete (7) cargos por el Artículo 5.15 de la Ley de Armas de 2000, 25 LPRA sec. 458n, por disparar o apuntar un arma de fuego.[1]

El 20 de noviembre de 2018, la representación legal de Ortega Vázquez radicó una *Moción en Solicitud de Orden*. Mediante esta, señalaron que contrataron los servicios de una psiquiatra privada con el propósito de evaluar a Ortega Vázquez y accesar a cualquier expediente médico de este.[2] Ante ello, el 5 de diciembre de 2018, el foro apelado emitió una *Orden* mediante la cual declaró Ha Lugar la solicitud de la defensa.[3] Luego de varios trámites procesales, el 11 de febrero de 2019, se celebró una Vista de Procesabilidad en la que testificó la psiquiatra del Estado, doctora Yamilka Rolón García, quien expresó que Ortega Vázquez se encontraba procesable.[4] Evaluado el testimonio de la psiquiatra, el foro *a quo* acogió la recomendación de esta.[5]

Posteriormente, el 22 de febrero de 2019, se celebró la Vista Preliminar del caso de epígrafe. Celebrada la referida vista, el foro juzgador encontró causa probable para juicio en contra de Ortega Vázquez por los delitos antes reseñados.[6] En su consecuencia, el 11

---

[1] Véase, *Acusación* de los autos originales de los casos DVI2019G0005, DVI2019G006, DVIG2019G0007, DVIG2019G0008, DVI2019G0009, DVI2019G0010, DLA2019G0028, DLA2019G0029, DLA2019G0030, DLA2019G0031, DLA2019G0032, DLA2019G0033, DLA2019G0034, DLA2019G0035.
[2] Véase, *Moción en Solicitud de Orden* del 20 de noviembre de 2018 en los autos originales de la *Vista Preliminar*.
[3] Véase, *Orden* del 5 de diciembre de 2018 en los autos originales de la *Vista Preliminar*.
[4] Véase, *Minuta* de la *Vista de Procesabilidad* del 11 de febrero de 2018 en los autos originales de la *Vista Preliminar*.
[5] Véase, *Resolución* del 11 de febrero de 2019 en los autos originales de la *Vista Preliminar*.
[6] Véase, *Resolución* del 22 de febrero de 2019 en los autos originales de la *Vista Preliminar*.

de marzo de 2019, se realizó la lectura de acusación, a la cual compareció el apelante junto a su representación legal.[7]

Luego de varios trámites procesales, el 28 de julio de 2019, se celebró la *Conferencia con Antelación a Juicio*.[8] En lo pertinente, la representación legal de Ortega Vázquez le indicó al foro primario que se proponía utilizar la defensa de insanidad mental, por lo que había contratado a la doctora Eva Landrón Colberg (Landrón Colberg).

Culminados los trámites procesales de rigor, se celebró el juicio por jurado los días 30 y 31 de octubre de 2019; 1, 4 y 6 de noviembre de 2019 y; 3 y 12 de diciembre de 2019. La prueba del Ministerio Público consistió en prueba documental y testimonial. Los testigos de cargo fueron: Wilmer Cintrón Millán, Wilson Cintrón Cruz, Jazmín Milagros Rivera Nieves, Nitza J. Morales Figueroa, el agente William A. García, el agente William Lugo Rodríguez, y el agente Julio Vázquez López. A su vez, el Ministerio Público puso a la disposición de la defensa los siguientes testigos: Mayra Pintado Millán, Edgar R. Padilla Hernández, Alberto Rivera Espinell, Ilianette Figueroa Ayala y el agente Aníbal Ayala Arocho. Asimismo, como parte de su prueba, el Ministerio Público sentó a testificar como peritos al Dr. Carlos F. Chávez Arias y al examinador de armas de fuego Carlos J. Del Valle Arroyo. Por su parte, la defensa no presentó prueba.

A continuación, resumiremos los aspectos relevantes de los testimonios de los testigos del Ministerio Público.

---

[7] Véase, *Minuta* de la vista de *Lectura de Acusación* del 11 de marzo de 2019 en los autos originales de los casos DVI2019G0005, DVI2019G0006, DVIG2019G0007, DVIG2019G0008, DVI2019G0009, DVI2019G0010, DLA2019G0028, DLA2019G0029, DLA2019G0030, DLA2019G0031, DLA2019G0032, DLA2019G0033, DLA2019G0034, DLA2019G0035.

[8] Véase, *Minuta* de la *Conferencia con Antelación a Juicio* del 28 de junio de 2019 en los autos originales de los casos DVI2019G0005, DVI2019G0006, DVIG2019G0007, DVIG2019G0008, DVI2019G0009, DVI2019G0010, DLA2019G0028, DLA2019G0029, DLA2019G0030, DLA2019G0031, DLA2019G0032, DLA2019G0033, DLA2019G0034, DLA2019G0035.

### **Wilmer Cintrón Millán**

El desfile de la prueba comenzó con el testimonio de Wilmer Cintrón Millán (Cintrón Millán). A preguntas del Ministerio Público, este indicó que llevaba más de veinte (20) años residiendo en el barrio Guadiana, sector La Hueca, en Naranjito.[9] Asimismo, señaló que vivía en el medio de una residencia de tres (3) pisos con su esposa y su hijo e hija; que en la parte de abajo de la residencia vivía su hermano Helmis Cintrón Millán (Helmis Cintrón) y en la parte de arriba su padre, Wilson Cintrón Cruz (Cintrón Cruz).[10]

Cintrón Millán declaró que, el 26 de septiembre de 2018, decidió ir al negocio El Escondite Racing (El Escondite), el cual describió como un cafetín con una barrita que quedaba a dos casas de su residencia.[11] Además, testificó que los dueños de El Escondite, Edgar Padilla y Mayra Pintado, eran parte de la familia.[12] Aclaró que decidió ir al negocio ese día con su esposa porque acostumbraba ir para llevarle comida a los dueños.[13]

Según Cintrón Millán ese día, su padre estaba sentado en una silla de la barra y comenzaron a conversar entre ellos y con Edgar Padilla.[14] Declaró que, en ese momento, llegó una grúa blanca, la cual aseguró que le pertenecía a Ortega Vázquez, a quien identificó en corte.[15] Aclaró que Ortega Vázquez era el esposo de su prima, Mariluz Pintado, y que lo conocía desde hace más de quince (15) años.[16]

Durante su testimonio, Cintrón Millán narró que, cuando llegó la grúa blanca, su esposa le dijo que regresaría a la casa, mientras que él le respondió que regresaría cuando terminara de

---

[9] Transcripción de la prueba oral (TPO), págs. 14-15.
[10] Íd.
[11] Íd., págs. 16-18.
[12] Íd.
[13] Íd., pág. 18.
[14] Íd.
[15] Íd.
[16] Íd., págs. 18-19.

conversar con su padre.[17] Igualmente, testificó que, en ese instante, entró Ortega Vázquez y lo saludó a él y a su padre, se paró entre ambos y ordenó una cerveza.[18] Mencionó, además, que cuando terminó de hablar con su padre, se despidió para irse a su casa.[19]

Cintrón Millán testificó que, estando en su casa, estuvo trabajando en construcción y se percató que le faltaba una herramienta, la cual aseguró que Edgar Padilla tenía.[20] Narró que volvió a El Escondite y se quedó afuera del mismo hablando con Mayra Pintado por unos cinco (5) minutos, en lo que Edgar Padilla se desocupada para pedirle la herramienta.[21] Además, sostuvo que, alrededor de las 5:00 p.m., escuchó a Ortega Vázquez decirle a su padre que tenía que hablar con él.[22]

Asimismo, Cintrón Millán continuó testificando que mientras se encontraba de espaldas, Ortega Vázquez salió del negocio y lo llamó por su nombre.[23] Añadió que le contestó a Ortega Vázquez "¿qué fue?", mientras que este le contestó que tenía que hablar con él aparte.[24] Narró que se movieron cerca de la grúa y le preguntó nuevamente "¿qué fue?".[25] Expresó que Ortega Vázquez le contestó qué carajo pasó en el negocio el Vagón, en donde le había solicitado una canción de karaoke que nunca puso.[26] Asimismo, aclaró que el Vagón es un negocio que no quedaba lejos de donde vive, que trabajaba allí *part time* como *DJ* y que ponía karaoke.[27] Igualmente, sostuvo que lo del evento del Vagón había ocurrido hacía dos (2) meses.[28]

---

[17] TPO, págs. 18-19.
[18] Íd.
[19] Íd.
[20] Íd.
[21] Íd., pág. 20.
[22] Íd.
[23] Íd.
[24] Íd.
[25] Íd.
[26] Íd.
[27] Íd.
[28] Íd., pág. 21.

En su testimonio, Cintrón Millán mencionó que le contestó a Ortega Vázquez que le había puesto la canción, pero que este nunca se paró de la silla.[29] Relató que, en ese momento, se le quedó mirando a Ortega Vázquez y que este le contestó que su karaoke no servía.[30] Sin embargo, según su testimonio, señaló que le había dicho a Ortega Vázquez que no estaba para ignorancias, que no estaba para problemas y que dejaran las cosas ahí.[31] Detalló que Ortega Vázquez se le quedó mirando y le dijo que no le tenía miedo, mientras que él le contestó que tampoco le tenía miedo y le dijo "pendejo".[32] De igual modo, declaró que se quedó parado porque no sabía si Ortega Vázquez le iba "a tirar".[33] También declaró que Ortega Vázquez no hizo nada y que le dijo a este que dejaran las cosas ahí, que no quería saber más de él.[34]

Cintrón Millán continuó narrando que, se volteó hacia el negocio El Escondite, se paró en la ventanilla y se quedó hablando con Mayra Pintado.[35] Mencionó, además, que vio a Ortega Vázquez entrar a El Escondite y que lo escuchó cuando dijo bajito "me voy".[36] Asimismo, relató que vio cuando Ortega Vázquez salió del negocio, se montó en su grúa blanca y bajó en reversa hacia la casa. Describió que, en el lugar, hay una cuesta empinada sin salida, una casa en el medio y luego seguía la casa de Ortega Vázquez.[37] Apuntó que se quedó hablando con Mayra Pintado, y como a los diez (10) minutos, le indicó a esta que iba para el baño de El Escondite un momento, el cual estaba ubicado al final del negocio.[38] Expresó que, cuando salió del baño, se percató de que Ortega Vázquez había llegado al negocio nuevamente, y cuando lo vio entrar, atestiguó que

---

[29] TPO, pág. 21.
[30] Íd., pág. 22.
[31] Íd.
[32] Íd.
[33] Íd.
[34] Íd.
[35] Íd.
[36] Íd., págs. 22-23.
[37] Íd., pág. 23.
[38] Íd.

este metió su mano derecha en la cintura, sacó un arma negra y la levantó.[39] Expresó que se asustó, salió corriendo del negocio y escuchó un tiro.[40]

Cintrón Millán testificó que, estando afuera del negocio, se escondió detrás de un carro, observó cuando Ortega Vázquez salió del negocio y escuchó varias detonaciones.[41] Manifestó que se asustó y escapó para su casa.[42] Empero, expresó que, cuando logró subir corriendo hacia su residencia, miró hacia atrás y se percató que Ortega Vázquez lo iba siguiendo.[43] Describió que brincó hacia una entrada de una cuesta de asfalto que le quedaba a su lado izquierdo, detrás de El Escondite, en donde quedaba ubicada la residencia de sus primos.[44] Añadió que, cuando saltó, miró hacia arriba y vio a Ortega Vázquez al lado de un poste apuntándole con el arma negra. Asimismo, estableció mediante su testimonio que, cuando vio a Ortega Vázquez, escuchó tres (3) detonaciones y corrió más rápido hasta llegar a la casa de sus primos, a quienes les dijo que Ortega Vázquez estaba descontrolado, "tirando tiros" en el negocio.[45] Relató que, posteriormente, escuchó muchos gritos y, cuando miró hacia arriba, vio a Ileannette Figueroa, la esposa de su hermano Helmis Cintrón, y a su mamá, Olga Millán, corriendo hacia el negocio.[46]

### Agente Xiomara Méndez Candelaria

A preguntas del Ministerio Público, Cintrón Millán aclaró que, ese día, había visto a su hermano, Helmis Cintrón, y lo saludó. Señaló que esto fue en el momento que él entró al baño, previo a la entrada de Ortega Vázquez al negocio con el arma.[47]

---

[39] TPO, pág. 24.
[40] Íd.
[41] Íd.
[42] Íd.
[43] Íd., págs. 24-25.
[44] Íd., pág. 24.
[45] Íd.
[46] Íd., págs. 25-26.
[47] Íd.

Cintrón Millán continuó relatando que logró subir a El Escondite y escuchó a la gente gritando que Ortega Vázquez había matado a su hermano, Helmis Cintrón.[48] Describió que, cuando entró a El Escondite, pudo observar a su hermano tirado en el suelo, al lado de la barra, y a su padre, Cintrón Cruz encima de este llorando.[49] Explicó que su hermano tenía un impacto de bala en el torso, al lado derecho de la "tetilla" derecha y al lado derecho de la barriga.[50] Expresó que, al ver que su hermano no reaccionaba, salió del negocio y observó a Eliezer Figueroa, hermano de la esposa de Helmis Cintrón, que junto a otra persona, lo montó en un vehículo Mazda *pickup* color rojo.[51] Asimismo, mencionó que, en el camino, se toparon con unas patrullas y una ambulancia, la cual llevó a Helmis Cintrón al CDT de Naranjito.[52] Mencionó que, en el CDT, recibió la noticia de que su hermano, Helmis Cintrón, había fallecido.[53]

Por otro lado, a preguntas de la defensa, Cintrón Millán admitió que Ortega Vázquez no le caía bien.[54] Asimismo, contestó que, el 27 de septiembre de 2018, prestó una declaración jurada sobre los hechos del caso, mediante la cual sostuvo que, cuando Ortega Vázquez llegó a El Escondite, su esposa le dijo que se fueran a la casa porque no le gustaba la presencia de este.[55] Añadió que fue Ortega Vázquez quien los saludó a él y a su padre, Cintrón Cruz, cuando entró al negocio El Escondite.[56] De igual modo, admitió que no incluyó en su declaración jurada que cuando Ortega Vázquez lo saludó estaba con mala actitud, de mal humor o con actitud de

---

[48] TPO, pág. 28.
[49] Íd.
[50] Íd., pág. 29.
[51] Íd.
[52] Íd., págs. 30-31.
[53] Íd., pág. 31.
[54] Íd., pág. 55.
[55] Íd.
[56] Íd.

pelea.[57] Además, expresó que, cuando Ortega Vázquez le solicitó hablar, no lo hizo de forma agresiva ni amenazante.[58]

En el contrainterrogatorio, Cintrón Millán describió el camino donde queda localizado El Escondite como un área estrecha, en donde los vehículos no pueden transitar libremente.[59] Igualmente, admitió que no incluyó en su declaración jurada que, en el momento en que salió a hablar con Ortega Vázquez, este último le dijera de forma molesta "qué carajo pasó".[60] Añadió, que tampoco incluyó en su declaración jurada que Ortega Vázquez lo estuviera amenazando, ni que haya sentido miedo porque le iba a tirar un puño.[61] De igual modo, declaró que, según su declaración jurada, le dijo molesto a Ortega Vázquez que no era amigo suyo.[62] También, admitió que en dicho escrito había mencionado que Ortega Vázquez estaba borracho y descontrolado, "tirando tiros".[63]

Por último, en el redirecto, luego de que se le refrescara la memoria con su declaración jurada, Cintrón Millán aclaró que, cuando le dijo a Ortega Vázquez que le puso la canción del karaoke, este se alteró y le dijo de forma arrogante y riéndose que su karaoke no servía.[64]

### Wilson Cintrón Cruz

El desfile de prueba continuó con el testimonio de Wilson Cintrón Cruz (Cintrón Cruz). A preguntas del Ministerio Público, Cintrón Cruz testificó que llevaba cuarenta y ocho (48) años residiendo en el barrio Guadiana, sector La Hueca en Naranjito y que era el padre de Cintrón Millán y de Helmis Cintrón.[65]

---

[57] TPO, pág. 56.
[58] Íd., págs. 59-60.
[59] Íd., pág. 61.
[60] Íd., pág. 66.
[61] Íd., pág. 69.
[62] Íd., págs. 71-72.
[63] Íd., págs. 75, 78.
[64] Íd., pág. 82.
[65] Íd., pág. 87.

Relató que, el 26 de septiembre de 2018, a eso de las 5:00 p.m., llegó a El Escondite y vio a Ortega Vázquez —a quien identificó en corte— parado frente a la barra.[66] Aclaró que Ortega Vázquez era el esposo de la prima de su esposa.[67] Asimismo, mencionó que entró a El Escondite y vio a su hijo, Cintrón Millán, afuera hablando con unos vecinos. Sostuvo que, acudió al negocio para ver las noticias y que, cuando se posicionó al lado de Ortega Vázquez en la barra, le preguntó a este si le podía explicar cómo arreglar un *switche* de su vehículo.[68] Añadió que, en ese momento, Ortega Vázquez le dijo que tenía que hablar con su hijo, Cintrón Millán, a lo que él le respondió "ok" y continuó viendo las noticias.[69] Mencionó que Ortega Vázquez salió del negocio hacia donde se encontraba la grúa; y que, posteriormente, vio a Cintrón Millán volver a la ventana de El Escondite y a Ortega Vázquez montarse en la grúa e irse en reversa.[70]

En su testimonio, Cintrón Cruz relató que vio a su hijo, Helmis Cintrón, entrar al negocio, saludarlo y sentarse a jugar máquinas de azar; mientras que su otro hijo, Cintrón Millán, entró al baño de El Escondite.[71] Continuó relatando que, cuando Cintrón Millán entró al baño, Ortega Vázquez llegó con la grúa.[72] Señaló que Ortega Vázquez se bajó de la grúa con una pistola negra en la mano derecha y, al ver que Cintrón Millán salía del baño, comenzó a dispararle.[73] Describió que, en ese momento, su hijo, Cintrón Millán, salió corriendo por la puerta que estaba pegada al baño y que Ortega Vázquez le continuaba disparando.[74] Asimismo, testificó que su hijo, Helmis Cintrón, y él no encontraban dónde pegarse, pero

---

[66] TPO, pág. 88.
[67] Íd., pág. 89.
[68] Íd., pág. 90.
[69] Íd.
[70] Íd.
[71] Íd., págs. 90-91.
[72] Íd., pág. 91.
[73] Íd., págs. 91-92.
[74] Íd., pág. 92.

intentaron salir por la puerta principal, cuando de momento se encontraron de frente con Ortega Vázquez. Sostuvo que Ortega Vázquez le disparó a su hijo, Helmis Cintrón.[75] Describió que el disparo fue a una distancia de dos (2) a tres (3) pies, casi a quemarropa, por lo que su hijo se desplomó; que intentó moverlo para ayudarlo y lo abrazó.[76] Señaló, además, que se levantó y le dijo a Ortega Vázquez "Albert[,] ¿qué te pasa? ¿[Q]ué pasa?", pero que este, sin piedad, le disparó en el rostro, por lo que le ocasionó una herida en la parte izquierda del mismo.[77] Explicó que se tocó la cara y estaba botando mucha sangre; que se lanzó encima de su hijo, Helmis Cintrón, a gritar y tratar de moverlo para ver si podía hacer algo por este.[78] Añadió que solo se oían disparos afuera y personas gritando "cuidado, cuidado".[79] Además, narró que, de momento, cesaron los disparos y cuando miró hacia afuera, ya la grúa de Ortega Vázquez no estaba. Indicó que procedieron a montar a su hijo, Helmis Cintrón, en una guagua roja y a él lo llevaron al CDT de Naranjito, donde se enteró que su hijo había fallecido.[80]

Durante el contrainterrogatorio, Cintrón Cruz admitió que prestó una declaración jurada el 27 de septiembre de 2018, en donde expresó que, cuando estaba hablando con Ortega Vázquez sobre mecánica, este último estaba bebiendo una cerveza, que estaba bien tomado y hablaba con dificultad.[81] A preguntas de la defensa, también contestó que no incluyó en su declaración jurada que, cuando Ortega Vázquez le indicó que quería hablar con Cintrón Millán, no lo dijo de forma violenta.[82] De igual modo, aceptó que, en

---

[75] TPO, pág. 92.
[76] Íd.
[77] Íd.
[78] Íd.
[79] Íd., pág. 93.
[80] Íd.
[81] Íd., págs. 109-110.
[82] Íd., pág. 110.

su declaración jurada, había mencionado que vio a Ortega Vázquez caminando de lado a lado como un "loco".[83]

### Jazmín Rivera Nieves

Jazmín Rivera Nieves (Rivera Nieves) testificó que reside en el barrio Lomas Vallés, sector Cuchillas en Naranjito.[84] Relató que, el 26 de setiembre de 2018, llegó a las 5:10 p.m. al negocio El Escondite junto a su esposo para entregarle un dinero al dueño, Edgar Padilla, a quien conocía hacía varios años.[85] Asimismo, testificó que, cuando llegaron al negocio, saludaron a Mayra Pintado, la esposa del dueño.[86] Continuó testificando que su esposo y ella se sentaron en la barra, en donde también se encontraba Cintrón Millán, y ordenaron dos cervezas.[87] Añadió que, de momento, se estacionó una grúa blanca frente a El Escondite, de la cual se bajó un caballero "cuarentón". Describió que este individuo entró al negocio apuntando hacia adentro con un arma de fuego en la mano derecha.[88] Narró que ella entró a la barra y el mencionado señor dijo algo que no pudo recordar; escuchó detonaciones y se lanzó al suelo con Mayra Pintado.[89]

Continuó relatando que siguió escuchando detonaciones, gente gritando y que, posteriormente, escuchó silencio.[90] Mencionó que decidió pararse para saber de su esposo y, en ese momento, vio al señor de la camisa roja, a quien identificó en corte como el apelante, por la ventanita del lado de la barra, apuntándole con una pistola.[91] Relató que este, sin mediar palabras, le hizo detonaciones y la hirió en la cadera derecha.[92] Explicó, además, que se tiró al suelo para que no le siguiera disparando; Mayra Pintado la echó

---

[83] TPO, pág. 118.
[84] Íd., pág. 123.
[85] Íd., pág. 124.
[86] Íd.
[87] Íd., pág. 125.
[88] Íd.
[89] Íd.
[90] Íd., pág. 126.
[91] Íd.
[92] Íd.

para atrás y ella le dio su teléfono a esta para que llamara a la policía.[93] Por último, señaló que fue atendida en el CDT de Naranjito y en Centro Médico, pero que todavía tenía la bala en su cuerpo.[94]

A preguntas de la defensa, Rivera Nieves aceptó que no surgía de su declaración jurada que haya tenido problemas con Ortega Vázquez.[95] Además, la defensa le cuestionó sobre si pudo observar a Ortega Vázquez cuando le disparó en la cadera, a lo que esta le respondió que lo vio apuntándole.[96] Igualmente, aceptó que, en su declaración jurada, había descrito que sintió el calentón cuando estaba en cuclillas tratando de taparse con la nevera de la barra, mientras que su cabeza estaba hacia el interior de esta cubriéndola.[97] No obstante, en el redirecto, aclaró que fue cuando se paró y alzó la cabeza que vio a Ortega Vázquez apuntándole con el arma y le hizo la detonación, por lo que se lanzó al suelo.[98]

### Agente William García Figueroa

El agente William García Figueroa (García Figueroa) declaró que, el 26 de septiembre de 2018, se encontraba de turno en su patrulla con el agente Ortiz; y que, a eso de las 5:00 p.m., recibió una llamada del retén indicando que, en el barrio Guadiana, sector La Hueca, había un individuo corriendo por la carretera haciendo disparos y que, además, habían personas heridas.[99] Narró que se dirigió hacia el lugar y, simultáneamente, cuando llegó al cruce de la Guadiana, llegaron otras patrullas y una ambulancia. [100] Continuó declarando que le indicó a los paramédicos que tuvieran precaución porque había una persona haciendo disparos y, en ese instante, llegó una guagua Mazda *pickup* color roja con una persona

---

[93] TPO, pág. 126.
[94] Íd.
[95] Íd., pág. 131.
[96] Íd.
[97] Íd., págs. 137-138.
[98] Íd., pág. 139.
[99] Íd., págs. 141-142.
[100] Íd., págs. 142-143.

herida de bala en la parte de la caja, la cual estaba acompañada de otras personas.[101] Añadió que la guagua provenía del sector La Hueca.[102]

El agente García Figueroa relató que las personas de la guagua le solicitaron ayuda, por lo que los paramédicos comenzaron a atenderlos inmediatamente y montaron a la persona herida en la ambulancia para llevarla al CDT.[103] Además, mencionó que el sargento Arce se personó al lugar y, posteriormente, se dirigieron al barrio Guadiana, sector La Hueca, donde ocurrieron los hechos.[104] Declaró que, cuando llegó al lugar de los hechos, se topó con una multitud de personas frente al negocio El Escondite y estos le dijeron: "él está allá abajo, él está allá abajo. Disparó. Está disparando allá abajo. Está en la casa. Está disparando. Disparó aquí y siguió disparando por ahí pa['] abajo. Eso fue Albert[o] el gruero", refiriéndose a Ortega Vázquez.[105]

Entonces, García Figueroa narró que dispersaron a las personas y se estableció un perímetro.[106] Explicó que se movilizó hacia el área donde se encontraba la persona que hizo los disparos y se topó con un grupo de personas.[107] Añadió que, más adelante, había un vehículo color verde y un caballero con camisa roja y pantalón azul recostado sobre este, el cual estaba acompañado de un joven.[108] El caballero de camisa roja y pantalón azul fue identificado en corte por García Figueroa como el apelante. Asimismo, relató que, cuando se acercó al caballero, este levantó sus manos y comenzó a decir "fui yo[,] fui yo" y caminó hacia donde los agentes diciendo "fui yo". Añadió que, cuando el caballero se le

---

[101] TPO, pág. 143.
[102] Íd., pág. 144.
[103] Íd.
[104] Íd., págs. 144-145.
[105] Íd., pág. 145.
[106] Íd.
[107] Íd., pág. 146.
[108] Íd.

fue acercando, se levantó la camisa y dijo "no tengo na['], no tengo na[']. Fui yo. Yo sé que vienen por mí, porque fui yo", y se les acercó.[109] Sobre ello, testificó que lo pusieron bajo arresto y le leyeron las advertencias de ley.[110] Además, mencionó que trasladaron al caballero al cuartel de Naranjito y que este no quiso firmar las advertencias.[111]

El agente García Figueroa testificó que, posteriormente, acudió al lugar de los hechos y refirió el caso al agente Aníbal Ayala de la División de Homicidios de Vega Baja para que continuara con la investigación.[112] Por último, a preguntas de la defensa, García Figueroa admitió que la información que le dieron las personas cuando se personó al lugar de los hechos era que el caballero estaba corriendo, moviéndose y disparando.[113]

### **Agente William Lugo Rodríguez**

El agente William Lugo Rodríguez (Lugo Rodríguez) testificó que pertenecía a la División de Reglamentos de Armas y Expedientes de Licencias.[114] Declaró que la Fiscalía de Bayamón le había solicitado que investigara si Ortega Vázquez poseía una licencia de armas.[115] Sobre ello, mencionó que había verificado en el sistema REAL y encontró que Ortega Vázquez no poseía una licencia de armas.[116] Durante el interrogatorio, se admitió el Exhibit #7 del Ministerio Público sobre una certificación que fue preparada por el agente Lugo Rodríguez, en la cual se establecía que Ortega Vázquez no poseía una licencia de armas.[117] Por su parte, la defensa lo contrainterrogó.

---

[109] TPO, pág. 147.
[110] Íd., pág. 148.
[111] Íd., pág. 149.
[112] Íd., pág. 152.
[113] Íd., pág. 156.
[114] Íd., pág. 160.
[115] Íd., pág. 169.
[116] Íd., pág. 170.
[117] Íd., págs. 170-172.

### Agente Julio Vázquez López

Por su parte, el agente Julio Vázquez López (Vázquez López) testificó que era agente de la División de Servicios Técnicos de la Policía.[118] Declaró que, el 26 de septiembre de 2018, se encontraba trabajando y acudió al barrio Guadiana, sector La Hueca en Naranjito, frente al negocio El Escondite, para cubrir una escena que estaba siendo investigada.[119] Narró que, una vez llegó al lugar, en donde estuvo aproximadamente de dos horas y media (2½) a tres (3), obtuvo los datos correspondientes y fotografió la escena.[120] Añadió que identificó las piezas evidenciarias, casquillos, plomo, impactos de bala y los vehículos que fueron impactados por las balas.[121] Además, señaló que ocuparon toda la evidencia del negocio y de una residencia en concreto que estaba localizada en la misma carretera del primero.[122] Mencionó, también, que en la referida casa tomaron fotografías y ocuparon la evidencia.[123] Mediante el testimonio del agente Vázquez López se admitieron los Exhibits #8-1 al #8-5 del Ministerio Público sobre impactos de bala a dos vehículos, los Exhibits #9, #9-1 al #9-13 sobre fotos de una residencia e impactos de bala en la misma, y el Exhibit #10 del Ministerio Público sobre once (11) casquillos de bala, nueve (9) milímetros, que fueron ocupados por este.[124] De otro lado, la defensa no le realizó preguntas al agente Vázquez López.

### Nitza Morales Figueroa

Nitza Morales Figueroa (Morales Figueroa) testificó que era residente del barrio Guadiana, sector La Hueca en Naranjito, en donde vivía con su esposo, Alberto Rivera Espinell (Rivera Espinell)

---

[118] TPO, pág. 173.
[119] Íd., págs. 175-176.
[120] Íd., pág. 177.
[121] Íd.
[122] Íd., pág. 178.
[123] Íd., pág. 179.
[124] Íd., págs. 179-187.

y su hija.[125] Relató que, el 26 de septiembre de 2018, a eso de las 5:00 p.m., decidió comer en el balcón de su residencia junto a su esposo. [126] Añadió que, mientras estaban comiendo, su esposo estaba arreglando un camión que se encontraba frente a su residencia.[127] Continuó relatando que el camión estaba encendido y que, mientras comían, a eso de 5:15 p.m., miró hacia arriba y Ortega Vázquez estaba disparando hacia ellos.[128] Además, identificó a Ortega Vázquez en corte y señaló que este vivía a cien (100) pies de su residencia.[129] Sostuvo que quedó en *shock* cuando Ortega Vázquez iba disparando hacía donde ella y su esposo. [130] A preguntas del Ministerio Público, aclaró que Ortega Vázquez disparaba hacia ellos; es decir, hacia ella y su esposo.[131] También, relató que, cuando vieron a Ortega Vázquez disparando, su esposo se levantó primero y, antes de entrar, le dijo "entra que nos están disparando".[132] No obstante, Morales Figueroa aclaró que seguía en *shock* y que se quedó mirando a Ortega Vázquez, a quien le gritó.[133] Explicó que no caía en cuenta sobre qué le pasaba a Ortega Vázquez.[134] Asimismo, narró que le gritó a Ortega Vázquez que qué le pasaba; sin embargo, este fue hacia donde ella.[135]

Morales Figueroa continuó relatando que, cuando entró a su residencia, se percató de que tenía sangre en el brazo derecho.[136] Describió que tenía un "rotito" en el *brasier*, en el seno derecho.[137] Añadió que la bala había salido de su cuerpo. [138] Narró que su esposo llamó al 911 y fue llevada en una ambulancia hasta el CDT

---

[125] TPO, pág. 188.
[126] Íd., pág. 189.
[127] Íd.
[128] Íd.
[129] Íd., pág. 190.
[130] Íd.
[131] Íd., pág. 191.
[132] Íd.
[133] Íd.
[134] Íd.
[135] Íd.
[136] Íd., pág. 192.
[137] Íd.
[138] Íd.

de Naranjito. [139] Añadió que, posteriormente, fue trasladada a Centro Médico.[140] A preguntas del Ministerio Público, describió que tenía una herida en ambos senos porque la bala entró por el lado derecho y salió por el izquierdo.[141]

Por otro lado, a preguntas de la defensa, Morales Figueroa admitió que, en la declaración jurada suscrita el 27 de septiembre de 2018, esta señaló que Ortega Vázquez iba "tirando tiros" a la casa y no a ellos específicamente. [142] Aceptó, también, que en su declaración jurada había mencionado que nunca había tenido problemas con Ortega Vázquez. [143] Contestó que, aunque ella le había preguntado que qué pasaba, Ortega Vázquez no reaccionó y siguió disparando; que ella no podía creer lo que estaba pasando.[144]

### Doctor Carlos Chávez Arias

Previo al comienzo del interrogatorio del doctor Carlos Chávez Arias (Chávez Arias), las partes estipularon que este era patólogo, trabajaba para el Instituto de Ciencias Forenses y que fue quien preparó la autopsia en el caso.[145] De este modo, el doctor Chávez Arias testificó que, el 30 de septiembre de 2018, recibió el cadáver de Helmis Cintrón en horas de la mañana para realizarle la autopsia. [146] Describió que el cuerpo llegó con una intervención médica y que, luego de que se reconoció el cuerpo, comenzó a examinarlo en forma externa. [147] Explicó que el examen externo reveló que Helmis Cintrón tenía una herida de bala con salida, localizada en la región postlateral derecha del tórax y la salida en el aspecto anterior izquierdo del tórax, casi llegando a la axila en la región axilar anterior.[148] Continuó testificando que, posteriormente,

---

[139] TPO, págs. 192-193.
[140] Íd., pág. 193.
[141] Íd., pág. 194.
[142] Íd., págs. 205-207.
[143] Íd., pág. 207.
[144] Íd., págs. 208-210.
[145] Íd., pág. 212.
[146] Íd., pág. 213.
[147] Íd.
[148] Íd.

le tomó Rayos X al cuerpo y, mediante esta, determinó que no había ningún proyectil en el mismo.[149] Describió que, al abrir el cuerpo, este revelaba que la herida de bala tenía una trayectoria perforando el aspecto posterolateral de la décima costilla derecha.[150] Asimismo, a preguntas de la defensa, contestó que, con los exámenes que le realizó al cuerpo, Helmis Cintrón pudo haber muerto a los pocos minutos de haber recibido la herida de bala.[151] Además, explicó que, en sus investigaciones, primero hace gráficos, obtiene fotografías, los hallazgos de autopsia y luego elabora el Informe Médico Forense.[152] Así, pues, sostuvo que la causa de muerte de Helmis Cintrón fue la herida de bala en el tórax y abdomen, mientras que la forma de muerte fue homicidio. De otro lado, durante el testimonio del doctor Chávez Arias, se marcó como Exhibit #12 del Ministerio Público el Informe Médico Forense que él preparó de Helmis Cintrón.[153]

Durante el contrainterrogatorio, la defensa le preguntó al doctor Chávez Arias sobre la trayectoria de la bala en el cuerpo de Helmis Cintrón, a lo que este explicó que habían varios escenarios probables.[154] Comenzó describiendo el escenario de abajo hacia arriba, el cual, usualmente, ocurre cuando se encuentra el occiso tirado en el suelo y le disparan desde abajo hacia arriba.[155] Añadió que, otro escenario, es cuando el occiso se agacha con la intención de protegerse y el disparo es de arriba hacia abajo, el cual aseguró que era el más probable que haya ocurrido en el caso de Helmis Cintrón.[156] También expresó que los demás escenarios eran menos probables.[157] En este caso, ofreció el ejemplo de cuando el tirador

---

[149] TPO, pág. 214.
[150] Íd.
[151] Íd., pág. 215.
[152] Íd., pág. 216.
[153] Íd.
[154] Íd., pág. 219.
[155] Íd.
[156] Íd.
[157] Íd.

está disparando desde el suelo y tira hacia arriba de una persona que se encuentra parada.[158] Por otro lado, indicó que la herida fue una a distancia; es decir, a más de tres (3) pies, puesto que la misma no tenía tatuaje de pólvora, negro de humo, ni impresión de arma de fuego. [159] No obstante, a preguntas de la defensa, no pudo precisar la distancia exacta del disparo.[160]

### Carlos Juan Del Valle Arroyo

Durante el interrogatorio directo, Carlos Juan Del Valle Arroyo (Del Valle Arroyo), declaró que era examinador de armas de fuego del Instituto de Ciencias Forenses.[161] Este fue calificado por el foro primario como perito de balística.[162]

Del Valle Arroyo testificó que se le asignó el caso de Ortega Vázquez para realizar una comparación microscópica, un examen de casquillos y un examen de proyectiles y sus derivados.[163] Según su testimonio, identificó once (11) casquillos, calibre nueve (9) milímetros, que se utilizó una sola arma y quince (15) proyectiles del mismo calibre y/o sus derivados, de los cuales seis (6) fueron disparados por la misma arma de fuego.[164] Aclaró que había un fragmento de proyectil de bala que fue disparado por un arma de fuego, pero no pudo determinar el calibre, la dirección, ni el total del estriado de este porque estaba mutilado. [165] Añadió que los proyectiles marcados del ocho (8) al quince (15) eran *bullets core*.[166]

Además, Del Valle Arroyo explicó que preparó el Exhibit #10 del Ministerio Público para cada una de las piezas, a las cuales se le asignó un número.[167] Igualmente, con su testimonio, se admitió el

---

[158] TPO, pág. 219.
[159] Íd.
[160] Íd., pág. 220.
[161] Íd., pág. 221.
[162] Íd., pág. 226.
[163] Íd.
[164] Íd., págs. 226-227.
[165] Íd., pág. 232.
[166] Íd.
[167] Íd.

Exhibit #13 del Ministerio Público sobre la certificación de examen que este preparó.[168]

En el contrainterrogatorio, se le cuestionó a Del Valle Arroyo sobre los fragmentos de un proyectil que no pudo concluir que era calibre nueve (9) milímetros, por lo que este admitió que pudo haber sido de otro calibre. [169] Además, admitió que, como no pudo determinar el calibre de algunos proyectiles, estos pudieron provenir de cualquier otra arma.[170] No obstante, aclaró en el redirecto que ese proyectil tenía una característica de clase poligonal, como todos los otros, y que ese dato no surgía del informe, pero sí de sus notas; empero, aseguró que solo hubo un arma de fuego.[171] A su vez, en el recontrainterrogatorio, afirmó que dicho dato era importante.[172]

Por otro lado, cabe destacar que, en el ínterin del juicio en su fondo, se dieron unos trámites procesales pertinentes a las controversias ante nuestra consideración que debemos reseñar. En particular, el 4 de mayo de 2021, se celebró un *Status Conference* en donde el Tribunal de Primera Instancia hizo constar que tenía preparadas las siguientes instrucciones para los miembros del jurado:

- 1.1 – Introductoria
- 1.5 – Resumen de la prueba
- 1.9 – Presunción de inocencia, peso de la prueba y duda razonable
- 1.10 – Credibilidad de los testigos
- 1.13 – Estipulaciones
- 2.1 – Evidencia directa y circunstancial
- 2.3 – Credibilidad de los testigos
- 2.4 – Inconsistencia en el testimonio
- 2.9 – Impugnación de los testigos mediante evidencia de parcialidad
- 2.10 – Evaluación de la prueba
- 2.22 – El silencio del acusado
- 2.23 – Declaraciones o manifestaciones del acusado fuera del tribunal
- 2.26 – Testimonio pericial
- 2.28 – Evidencia demostrativa
- 2.31 – Las presunciones

---

[168] TPO, págs. 235-236.
[169] Íd., pág. 237.
[170] Íd., págs. 237-238.
[171] Íd., pág. 239.
[172] Íd., págs. 240-241.

- 2.32 – Qué es presunción de inocencia, duda razonable y peso de la prueba
- 2.33 – Identificación del acusado
- 5.1 – Asesinato en primer grado y/o tentativa de asesinato
- 18.1 – Portación y uso de armas de fuego sin licencia
- 18.5 – Disparar o apuntar armas de fuego
- 22.5 – Deliberación y veredicto[173]

Igualmente, el foro primario le indicó a las partes que podían presentar sus instrucciones al jurado, por escrito. Así, el 28 de junio de 2021, el Ministerio Público sometió una *Moción sobre Instrucciones al Jurado por el Ministerio Público,* en donde señaló que evaluó los proyectos de instrucciones propuestos en los años 2006, 2008 y 2019.[174] Sugirió las siguientes instrucciones tomadas del proyecto del 2008 y del 2019: 1.1 – Instrucción Introductoria (2008); 1.2 – Conducta del Jurado (2008); 1.3 – Toma de Notas y Preguntas del Jurado (2008); 1.4 – Prohibición a Inspeccionar Cualquier Lugar o Lugares Relacionados con los Hechos (2008); 1.5 – Manifestaciones, Comentarios y Argumentos de las Partes y del Juez o de la Jueza Durante el Juicio (2008); 1.6 – Objeciones y su Resolución (2008); 1.7 – Elementos del Delito (2008); 1.8 – Orden del Juicio (2008); 1.9 – Presunción de Inocencia, Peso de la Prueba y Duda Razonable (2008); 1.10 – Credibilidad de Testigos (2008); 1.12 – Advertencias al Jurado sobre Publicidad (2008); 1.13 – Estipulaciones (2008); 2.1 – Evidencia Directa y Circunstancial-Inferencias (2008); 2.3 – Credibilidad de Testigos (2008); 2.4 – Testigos Faltando a la Verdad-Inconsistencia en el Testimonio (2008); 2.10 – Evaluación de la Prueba (2008); 2.22 – Silencio del Acusado o de la Acusada (2008); 2.23 – Declaración o Manifestaciones del Acusado o de la Acusada Fuera del Tribunal

---

[173] Véase, *Minuta* de la vista de *Status Conference* del 4 de mayo de 2021 en los autos originales de los casos DVI2019G0005, DVI2019G0006, DVIG2019G0007, DVIG2019G0008, DVI2019G0009, DVI2019G0010, DLA2019G0028, DLA2019G0029, DLA2019G0030, DLA2019G0031, DLA2019G0032, DLA2019G0033, DLA2019G0034, DLA2019G0035.

[174] Véase, *Moción sobre Instrucciones al Jurado Sugeridas por el Ministerio Público* en los autos originales del Tomo II del caso DVI2019G0005.

(2008); 2.24 – Prueba de Circunstancias Relativas al Peso y Credibilidad de Declaraciones o Manifestaciones del Acusado o de la Acusada Fuera del Tribunal (2008); 2.26 – Testimonio Pericial (2008); 2.28 – Evidencia Demostrativa (2008); 2.31 – Presunciones (2008); 2.32 – Presunción de Inocencia - Duda Razonable; Peso de la Prueba (2008); 2.33 – Identificación del Acusado o de la Acusada (2008); 3.1 – Persona Responsable (2008); 3.2 – Autores y Autoras-Definición (2008); 4.2 – Delito Intencional (2008); 4.1 – Formas de Comisión (2019); 4.3 – Causalidad (2019); 4.5 – Elementos Subjetivos del Delito; A Propósito, Con Conocimiento o Temerariamente (2019); 4.13 – Tentativa (2019); 5.1 – Asesinato en Primer Grado a Propósito o con Conocimiento (Art. 93(a) del Código Penal de 2012) (2019); 5.9 – Tentativa de Asesinato en Primer Grado (Art. 93 del Código Penal de 2012) (2019); 13.7 – Portación y Uso de Armas de Fuego Sin Licencia (Art. 5.04) (2019); 13.16 – Disparar o Apuntar Armas (Art. 5.15) (2019); 22.3 – Estipulaciones (2008); 26.1 – Resumen de la Evidencia (2019); 26.2 – Deliberación y Veredicto (2019); 22.2 – Presunción de Inocencia, Peso de la Prueba y Duda Razonable (2008).

Por su parte, el 1 de julio de 2021, la representación legal de Ortega Vázquez presentó una *Moción de Instrucciones Especiales al Jurado Sugeridas por la Defensa.*[175] Sugirió las siguientes instrucciones al jurado sacadas del Proyecto de Instrucciones al Jurado de 2019: 1.2 – Función del Jurado; 1.6 – Credibilidad de Testigos; 1.7 – Presunción de Inocencia, Derecho a la No Autoincriminación; 2.1 – Informes Finales; 2.2 – Introducción; 3.10 – Evaluación y Suficiencia de la Prueba; 4.15 – De los Delitos y sus Elementos; 5.13 – Asesinato Atenuado Como Delito Menor Incluido (Art. 95 del Código Penal de 2012); 5.19 – Homicidio Negligente

---

[175] Véase, *Moción de Instrucciones Especiales al Jurado Sugeridas por la Defensa* en los autos originales del Tomo II del caso DVI2019G0005.

Menos Grave; Como Delito Menor Incluido (Art. 95 del Código Penal de 2012); 6.6 – Agresión Grave Atenuada; Como Delito Menor Incluido (Art. 109A del Código Penal de 2012).

Ese mismo día, el foro sentenciador celebró una vista en donde las partes discutieron las instrucciones al jurado.[176] En lo pertinente, la defensa solicitó que se le impartiera al jurado la instrucción sobre asesinato en segundo grado. Por su parte, el Ministerio Público se opuso, argumentando que, en la moción sometida por la representación legal de Ortega Vázquez, se solicitaba la instrucción de asesinato atenuado y no de asesinato en segundo grado. En cuanto a la instrucción de asesinato atenuado, el Ministerio Público también se opuso y argumentó que hubo ausencia de prueba sobre el elemento de súbita pendencia.

Así las cosas, el 1 de septiembre de 2021, continuaron los procedimientos del juicio en su fondo. Durante este, el foro primario sostuvo que la instrucción 5.13 de asesinato atenuado del Proyecto de Instrucciones al Jurado de 2019 no sería impartida, puesto que no se cumplía con los requisitos que exige la ley. Sin embargo, a preguntas del foro sentenciador, la representación legal de Ortega Vázquez explicó que surgía de los testimonios que los testigos se refirieron a Ortega Vázquez como "loco", "que estaba disparando como loco", "como si estuviera desesperado". El tribunal de instancia señaló que de la prueba se desprendía la existencia de un espacio de tiempo donde debió haber reflexión. A su vez, el Ministerio Público apuntó que la única persona que habló sobre lo antes señalado fue Cintrón Millán, quien solo manifestó palabras genéricas, por lo que esto no quería decir que Ortega Vázquez estaba "loco". Atendido el asunto, el foro de origen resolvió que no procedía

---

[176] Véase, *Minuta* de la vista de *Status Conference* del 1 de julio de 2021 en los autos originales del Tomo II del caso DVI2019G0005.

impartir la instrucción 5.13 al jurado a base del caso *Pueblo v. Ortiz Vicente* y anotó la objeción de la defensa.

El 27 de septiembre de 2021, continuaron los procedimientos del juicio por jurado en donde las partes presentaron sus informes finales. [177] Asimismo, el foro *a quo* hizo un resumen de los testimonios y la evidencia marcada durante el proceso.

Al día siguiente, durante la continuación del juicio, el Tribunal de Primera Instancia le impartió las siguientes instrucciones del Proyecto del 2019 al jurado: 3.25 – Evidencia de Motivos; 3.26 – Silencio del Acusado; 3.32 – Testimonio Pericial; 3.34 – Evidencia Ilustrativa; 3.36 – Cadena de Custodia; 3.39 – Presunciones; 3.40 – Presunción de Inocencia; 3.41 – Identificación de la Persona Acusada; 4.1 – Formas de Comisión; 4.2 – Acción Voluntaria, Posesión; 4.3 – Causalidad; 4.5 – Elementos Subjetivos del Delito: A Propósito, Con Conocimiento o Temerariamente; 4.13 – Tentativa; 4.15 – Los Delitos y sus Elementos; 5.9 – Asesinato en Primer Grado.[178]

El foro primario también impartió las siguientes instrucciones al jurado tomadas del Proyecto del 2008: 18.4 – Posesión y Uso de Arma de Fuego Sin Licencia; 18.1 – Portación y Uso de Armas de Fuego sin Licencia; 18.5 – Disparar y Apuntar Armas. Además, el foro sentenciador le indicó al jurado que el veredicto podía ser "culpable" o "no culpable" y que este debía ser por unanimidad. Al finalizar con las instrucciones al jurado, el foro de instancia le preguntó a las partes si tenían objeción. Por su lado, la defensa indicó que sí tenía objeción.[179]

---

[177] Véase, *Minuta* de la *Continuación de Juicio por Jurado* del 27 de septiembre de 2021 en los autos originales del Tomo II del caso DVI2019G0005.

[178] Véase, *Minuta* del *Acto de Continuación de Juicio por Jurado* del 28 de septiembre de 2021 en los autos originales del Tomo II del caso DVI2019G0005.

[179] Surge de la TPO que las partes se acercaron al estrado. No obstante, lo discutido por estas aparece en la transcripción como "ininteligible". Véase, TPO, pág. 336.

Sometido el caso, el jurado emitió un veredicto unánime de culpabilidad en contra de Ortega Vázquez por todos los delitos que se le acusaban.[180] Conforme a ello, el 8 de diciembre de 2021, el Tribunal de Primera Instancia dictó *Sentencia* mediante la cual condenó a Ortega Vázquez a cumplir ciento cuarenta y cuatro (144) años de cárcel por todos los cargos que pesaban en su contra.[181] Según surge de la *Sentencia,* las infracciones al Código Penal — asesinato en primer grado y las tentativas por asesinato— se cumplirían de manera concurrente. De otro lado, las infracciones a la Ley de Armas de 2000, *supra,* se cumplirían consecutivamente entre sí y con las penas impuestas bajo el Código Penal.

Inconforme, el 14 de diciembre de 2021, recibido en la Secretaría de este Tribunal el 5 de abril de 2022, la parte apelante acudió ante nos mediante el recurso de epígrafe y señaló los siguientes errores:

PRIMERO: COMETIÓ GRAVE ERROR EL TRIBUNAL DE PRIMERA INSTANCIA [AL] NO IMPARTIR AL JURADO INSTRUCCIONES SOBRE INTOXICACIÓN VOLUNTARIA (ART. 42 DEL CÓDIGO PENAL), ASÍ COMO DE LOS DELITOS MENORES INCLUIDOS DE ASESINATO EN SEGUNDO GRADO Y AGRESIÓN, AUN CUANDO DESFILÓ PRUEBA DE QUE EL ACUSADO SE ENCONTRABA "BORRACHO" Y "BIEN TOMADO" DURANTE LOS HECHOS, EN VIOLACIÓN A LOS DERECHOS DEL ACUSADO A UN JUICIO JUSTO ANTE JURADO Y AL DEBIDO PROCESO DE LEY, GARANTIZADOS POR EL ART. II[,] SEC. 11 DE LA CONSTITUCIÓN DE PUERTO RICO.

SEGUNDO: COMETIÓ GRAVE ERROR EL TRIBUNAL DE PRIMERA INSTANCIA [AL] NO IMPARTIR AL JURADO INSTRUCCIONES SOBRE ASESINATO ATENUADO Y AGRESIÓN GRAVE ATENUADA, AUN CUANDO LA PRUEBA DE CARGO TENDIÓ A ESTABLECER QUE EL ACUSADO SOSTUVO UNA DISCUSIÓN ANTES DE LOS HECHOS, LA CUAL PUDO HABER PROVOCADO AL ACUSADO UNA PERTURBACIÓN MENTAL O EMOCIONAL SUFICIENTE PARA LA CUAL HABÍA UNA EXPLICACIÓN, EN VIOLACIÓN A LOS DERECHOS DEL ACUSADO A UN

---

[180] Véase, TPO, pág. 336.
[181] Véase, *Sentencia* del 8 de diciembre de 2021 en los autos originales del Tomo II del caso DVI2019G0005 y los autos originales de los casos DVI2019G006, DVIG2019G0007, DVIG2019G0008, DVI2019G0009, DVI2019G0010, DLA2019G0028, DLA2019G0029, DLA2019G0030, DLA2019G0031, DLA2019G0032, DLA2019G0033, DLA2019G0034, DLA2019G0035.

JUICIO JUSTO ANTE JURADO Y AL DEBIDO PROCESO DE LEY, GARANTIZADOS POR EL ART. II[,] SEC. 11 DE LA CONSTITUCIÓN DE PUERTO RICO.

TERCERO: PROCEDE LA REVOCACIÓN DE SEIS SENTENCIAS POR INFRACCIÓN AL ART. 5.15 DE LA LEY DE ARMAS A BASE DEL PRINCIPIO DE CONCURSO DE DISPOSICIONES PENALES, DADO [A] QUE SE BASARON EN LOS MISMOS HECHOS QUE DIERON LUGAR A LAS ACUSACIONES POR ASESINATO EN PRIMER GRADO Y TENTATIVAS [*SIC*] DE ASESINATO EN PRIMER GRADO, SIENDO ESTOS DELITOS LOS DE MAYOR ALCANCE DE PROTECCIÓN AL BIEN JURÍDICO AFECTADO Y ABSORBÍAN LA DISPOSICIÓN DE MENOR AMPLITUD, QUE ERA EL DELITO DE APUNTAR O DISPARAR CON UN ARMA DE FUEGO EN VIOLACIÓN AL ART. 9(B) DEL CÓDIGO PENAL Y AL DEBIDO PROCESO DE LEY.

CUARTO: PROCEDE LA REVOCACIÓN DE LA SENTENCIA EMITIDA EN LOS CASOS DVI2019G001 Y DLA2019G0033 POR LOS DELITOS DE TENTATIVA DE ASESINATO Y APUNTAR CON UN ARMA DE FUEGO HACIA ALBERTO RIVERA ESPINELL, DEBIDO A QUE LA PRUEBA NO ESTABLECIÓ MÁS ALLÁ DE DUDA RAZONABLE QUE EL ACUSADO HUBIESE APUNTADO NI DISPARADO HACIA DICHA PERSONA, EN VIOLACIÓN AL DERECHO DEL APELANTE A LA PRESUNCIÓN DE INOCENCIA Y AL DEBIDO PROCESO DE LEY.

QUINTO: PROCEDE LA REVOCACIÓN DE LA SENTENCIA EMITIDA EN EL CASO DVI2019G0005, POR EL DELITO DE ASESINATO EN PRIMER GRADO, DEBIDO A QUE LA PRUEBA NO FUE SATISFACTORIA PARA ESTABLECER QUE EL ACUSADO ACTUÓ A PROPÓSITO O CON CONOCIMIENTO AL DISPARAR CONTRA HELMIS CINTRÓN, EN VIOLACIÓN AL DERECHO DEL APELANTE A LA PRESUNCIÓN DE INOCENCIA Y AL DEBIDO PROCESO DE LEY.

Tras varios incidentes procesales, el 30 de marzo de 2023, la parte apelante, representada por la Sociedad para la Asistencia Legal, presentó el escrito intitulado *Alegato del Apelante*. Por su parte, el 14 de junio de 2023, el Pueblo de Puerto Rico, representado por la Oficina del Procurador General de Puerto Rico, compareció mediante *Alegato de el [sic] Pueblo*.

Con el beneficio de la comparecencia de las partes, así como la transcripción estipulada de la prueba oral, los autos originales y la prueba documental, nos disponemos a resolver el recurso que nos ocupa.

**II**

**A**

En nuestro ordenamiento jurídico, a toda persona acusada de delito le cobija una presunción de inocencia. La Sección 11 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico decreta que: "[e]n todos los procesos criminales, [la persona acusada] disfrutará del derecho a un juicio rápido y público, a ser notificad[a] de la naturaleza y causa de la acusación recibiendo copia de la misma, a carearse con los testigos de cargo, a obtener la comparecencia compulsoria de testigos a su favor, a tener asistencia de abogado [o abogada] y a gozar de la presunción de inocencia". Art. II, Sec. 11, Const. ELA, LPRA, Tomo 1. Es por ello que, el Estado es quien tiene el peso de la prueba. *Pueblo v. Negrón Ramírez,* 2024 TSPR 41, 213 DPR __ (2024), resuelto el 23 de abril de 2024; *Pueblo v. Toro Martínez,* 200 DPR 834 (2018); *Pueblo v. Irizarry,* 156 DPR 780, 788 (2002).

En respuesta a tal decreto, en los casos penales permea el principio fundamental de que se deben probar más allá de duda razonable todos los elementos del delito, su conexión con la persona acusada y la intención o negligencia criminal de esta. *Pueblo v. Negrón Ramírez,* supra; *Pueblo v. Resto Laureano,* 206 DPR 963 (2021) (sentencia), citando a *Pueblo v. Toro Martínez,* supra.

Para determinar que la prueba controvierte la presunción de inocencia, esta debe ser suficiente y satisfactoria; es decir, que produzca certeza o convicción moral en el juzgador. *Pueblo v. Resto Laureano,* supra, pág. 967, citando a *Pueblo v. Carrasquillo Carrasquillo,* 102 DPR 545, 552 (1974). Tal exigencia no significa que el Ministerio Público deba presentar evidencia dirigida a establecer la culpabilidad de la persona acusada con certeza matemática. *Pueblo v. Negrón Ramírez,* supra; *Pueblo v. Feliciano Rodríguez,* 150 DPR 443, 447 (2000) (sentencia), citando a *Pueblo v.*

*Cruz Granados,* 116 DPR 3, 21-22 (1984) (sentencia). Lo que se requiere es prueba suficiente, que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. *Íd.*; *Pueblo v. García Colón I,* 182 DPR 129, 174-175 (2011).

En ese sentido, la prueba presentada por el Ministerio Público debe probar todos los elementos del delito y la conexión de la persona imputada con el referido delito. *Pueblo v. Negrón Ramírez,* supra. Por tal razón, la carencia de prueba sobre alguno de los elementos del delito implicaría el incumplimiento por parte del Estado con su carga probatoria y supondría la absolución de la persona acusada respecto al delito imputado. *Íd.*

Por su parte, la Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, R. 110, establece que la persona acusada se presumirá inocente. Además, dispone que, mientras no se probare lo contrario, y en caso de existir duda razonable acerca de su culpabilidad, esta será absuelta. Hay duda razonable cuando el juzgador siente insatisfacción con la prueba, una vez sopesados todos los elementos involucrados en el caso. *Pueblo v. Casillas, Torres,* 190 DPR 398 (2014).

Inicialmente, le corresponde al juzgador de hechos determinar si se satisfizo el estándar probatorio correspondiente y si, en su consecuencia, se probó la culpabilidad de la persona acusada más allá de duda razonable. *Pueblo v. Negrón Ramírez,* supra. Es decir, quien vendrá llamado a evaluar y aquilatar la evidencia presentada ante sí para determinar cuáles hechos han quedado probados o establecidos es el juzgador de los hechos. *Pueblo v. Toro Martínez,* supra, pág. 858; *Pueblo v. Acevedo Estrada,* 150 DPR 84, 98 (2000); *Pueblo v. Torres Rivera,* 137 DPR 630, 641 (1994). En casos criminales con derecho a juicio por jurado, esta función le corresponde al Jurado, el cual está constitucionalmente

encomendado a recibir la prueba, adjudicar los hechos en base a esta y aplicar el derecho, según le instruya el tribunal. *Pueblo v. Negrón Ramírez*, supra; *Pueblo v. Santa Vélez*, 177 DPR 61, 65-66 (2009); *Pueblo v. Negrón Ayala*, 171 DPR 406, 414 (2007).

En cuanto a la apreciación imparcial de la prueba, resulta harto conocido que la evaluación que de esta realicen los juzgadores de hechos merece respeto y confiabilidad. *Pueblo v. Resto Laureano*, supra, pág. 968. Por ello, las determinaciones de hechos probados que haya hecho el juzgador primario no se deben descartar arbitrariamente, a menos que de la prueba admitida surja que no hay base suficiente para apoyarlas. *Pueblo v. Acevedo Estrada*, supra, pág. 99. En ese sentido, "nuestro esquema probatorio está revestido por un manto de deferencia hacia las determinaciones que realizan los juzgadores de primera instancia en cuanto a la prueba testifical que se presenta ante ellos". *Pueblo v. Arlequín Vélez*, 204 DPR 117, 146-147 (2020), citando a *Pueblo v. Toro Martínez*, supra, pág. 857. Dicha deferencia emana del hecho de que los juzgadores de instancia se encuentran en una mejor posición para evaluar, aquilatar y adjudicar la prueba presentada ante ellos. *Pueblo v. Negrón Ramírez*, supra; *Pueblo v. Toro Martínez*, supra, págs. 857-858; *Pueblo v. García Colón I*, supra, pág. 165; *Pueblo v. Bonilla Romero*, 120 DPR 92, 111 (1987). Lo anterior cobra mayor vigencia cuando se trata de la prueba testifical (oral) desfilada en el juicio. *Íd.* Ello debido a que son los juzgadores de hechos los que pueden oír y apreciar la forma de declarar de los testigos, así como su comportamiento. *Íd.*; *Pueblo v. Santia Rodríguez*, 129 DPR 49, 62-63 (1991).

Por tanto, en las causas de acción de naturaleza criminal, la deferencia ante la apreciación de los foros primarios solo cederá si ha mediado prejuicio, parcialidad o pasión, o si la prueba no concuerda con la realidad fáctica, resultare increíble o imposible.

*Pueblo v. Negrón Ramírez,* supra; *Pueblo v. Santiago et al.*, 176 DPR 133, 147-148 (2009). Debe entenderse, pues, que un Tribunal revisor solo podrá intervenir con las conclusiones de hecho del foro primario cuando la apreciación total de la prueba no represente su balance más racional, justiciero y jurídico. *Pueblo v. Resto Laureano,* supra, pág. 968, citando a *C y otros v. S.L.G. Ritch,* 176 DPR 951 (2009); *Cárdenas Maxán v. Rodríguez Rodríguez,* 125 DPR 702, 714 (1990).

Si bien la determinación de si se probó la culpabilidad de la persona acusada más allá de duda razonable es un asunto de hecho y derecho revisable en apelación, nuestro esquema probatorio está revestido de deferencia a las determinaciones que los juzgadores de primera instancia hacen sobre la prueba testifical, ya sea un juez, una jueza o un panel de jurados. Esto, debido a que dicho foro está en mejor posición de aquilatarla. *Pueblo v. Resto Laureano,* supra, pág. 969. Véase, además, *Pueblo v. Rodríguez Pagán,* 182 DPR 239 (2011); *Pueblo v. Irizarry,* supra, pág. 788; *Pueblo v. Rivero, Lugo y Almodóvar,* 121 DPR 454 (1988).

Cónsono con lo anterior, el Tribunal Supremo de Puerto Rico ha manifestado que la deferencia debida a los foros de instancia se extiende tanto a la adjudicación de credibilidad que estos realizan sobre los testigos que declaran ante sí, como a las determinaciones de hechos realizadas por el juzgador. *Pueblo v. Negrón Ramírez,* supra; *Pueblo v. Toro Martínez,* supra, pág. 858; *Trinidad v. Chade,* 153 DPR 280, 291 (2001); *Pueblo v. Torres Rivera,* supra, págs. 640-641. Ahora bien, como excepción a este principio de deferencia, es norma conocida que, en cuanto a la apreciación de la prueba documental que se haya presentado en un juicio, los Foros apelativos están en las mismas condiciones que el tribunal de instancia para intervenir y apreciar *de novo* dicha prueba. *Íd.; Díaz García v. Aponte Aponte,* 125 DPR 1, 13 (1989); *Ramírez, Segal &*

*Látimer v. Rojo Rigual,* 123 DPR 161, 166 esc. 1 (1989); *Ortiz v. Cruz Pabón,* 103 DPR 939, 947 (1975).

Por otra parte, es premisa reiterada que la deliberación de un jurado está revestida de una presunción de regularidad. *Pueblo v. Echevarría Rodríguez I,* 128 DPR 299 (1991). Además, se ha establecido que se presume que el jurado basó su veredicto en la prueba, y no en hechos extraños a esta. *Pueblo v. Prados García,* 99 DPR 384, 394 (1970). Por tanto, una vez el jurado haya llegado a un acuerdo y entregare el veredicto correspondiente al juez o la jueza, de ser considerado conforme a ley, el mismo será aceptado por el tribunal y remitido al secretario. Regla 145 de Procedimiento Criminal, 34 LPRA Ap. II, R. 145. Así, una vez acontecido lo anterior, se crea un estado de derecho irreversible que solo podrá ser revocado por un Tribunal apelativo. *Pueblo v. Oyola Rodríguez,* 132 DPR 1064 (1993). En este contexto y aun el ámbito de un caso criminal en el que la institución del jurado asume la posición del juzgador de hechos, sabido es que, en ausencia de error manifiesto, prejuicio, pasión o parcialidad, el foro intermedio está impedido de intervenir con el dictamen de que trate. *Pueblo v. Narváez Narváez,* 122 DPR 80 (1988).

**B**

De otra parte, toda persona acusada de delito grave o de un delito que apareje una pena de tal clasificación, le asiste la máxima constitucional que provee para que sea procesada en un juicio por un jurado imparcial. Art. II, Sec. 11, Const. ELA, LPRA, Tomo 1; *Pueblo v. Agudo Olmeda,* 168 DPR 554 (2006). El juicio por jurado implica que la culpabilidad, o no culpabilidad de la persona imputada, será determinada por un grupo representativo de la comunidad, luego de que, quien presida el proceso, le instruya sobre la norma jurídica aplicable a los hechos que considera. *Pueblo v. Negrón Ayala,* 171 DPR 406 (2007); *Pueblo v. Echevarría Rodríguez*

*I,* 128 DPR 299 (1991); *Pueblo v. Laboy,* 110 DPR 164 (1980). La función del jurado estriba en alcanzar un veredicto libre de coerción, consistente, a su vez, con la ley y las particularidades del caso. *Pueblo v. Negrón Ayala,* supra; *Pueblo v. González Colón,* 110 DPR 812 (1981); *Pueblo v. Rosario Centeno,* 90 DPR 874 (1964); Véase, además, J. M. Farinacci Fernós, *La Carta de Derechos*, San Juan, Editorial de la Universidad Interamericana de Puerto Rico, 2021, pág. 211; E. Batista Ortiz, *El Jurado: su función, características y propósitos*, 3ra ed., San Juan, Ed. SITUM, 2007, pág. 1.

Para que los miembros del jurado ejerzan con corrección y propiedad la responsabilidad que les es encomendada, resulta imperativo que se le transmitan todos los elementos de juicio que deben considerar previo a disponer sobre la relación de la persona acusada en el asunto. En ese sentido, las instrucciones al jurado se perfilan como mecanismo mediante el cual estos advienen al conocimiento efectivo del derecho aplicable al caso. *Pueblo v. Rodríguez Vicente,* 173 DPR 292 (2008). Su propósito es ilustrar y familiarizar a los miembros de este cuerpo con las normas básicas de ley en las cuales deben fundamentar su veredicto. El estado de derecho exige que las instrucciones que el juez o la jueza imparta al jurado sean correctas, claras, precisas y lógicas. *Pueblo v. Acevedo Estrada,* 150 DPR 84 (2000); *Pueblo v. Echevarría Rodríguez I,* supra; *Pueblo v. Andrades González,* 83 DPR 849 (1961). En consecución de este principio, la Regla 137 de Procedimiento Criminal, 34 LPRA Ap. II, R. 137, dispone que:

> Terminados los informes, el tribunal deberá instruir al jurado haciendo un resumen de la evidencia y exponiendo todas las cuestiones de derecho necesarias para la información del jurado. Por estipulación de las partes, hecha inmediatamente antes de empezar las instrucciones y aprobada por el tribunal, se podrá omitir hacer el resumen de la evidencia. Todas las instrucciones serán verbales a menos que las partes consintieren otra cosa. Cualquiera de las partes podrá presentar al tribunal una petición escrita de que se den determinadas instrucciones, al terminar el desfile de la

prueba, o anteriormente si el tribunal razonablemente así lo ordena. Deberá servirse copia de dicha petición a la parte contraria. El tribunal podrá aceptar o rechazar cualquiera o todas dichas peticiones, anotando debidamente su decisión en cada una, e informará a las partes de su decisión antes de que [e]stas informen al jurado. Ninguna de las partes podrá señalar como error cualquier porción de las instrucciones u omisión en las mismas a menos que planteare su objeción a ellas o solicitare instrucciones adicionales antes de retirarse el jurado a deliberar, exponiendo claramente los motivos de su impugnación, o de su solicitud. Se le proveerá oportunidad para formular [e]stas fuera de la presencia del jurado. El tribunal procederá entonces a resolver la cuestión, haciendo constar su resolución en el expediente o trasmitiendo cualquier instrucción adicional que estimare pertinente. Al terminar las instrucciones el tribunal nombrará al presidente del jurado y ordenará que el jurado se retire a deliberar. En sus deliberaciones y veredicto el jurado vendrá obligado a aceptar y aplicar la ley según la exponga el tribunal en sus instrucciones.

A la luz del transcrito precepto, el juzgador de instancia está llamado a instruir apropiadamente a los miembros del jurado sobre todas las cuestiones sometidas a su escrutinio. En el ánimo de traer a su atención los hechos esenciales ventilados en sala, como norma, debe resumir la prueba desfilada, para evitar que cuestiones irrelevantes en el asunto se consideren al momento de su resolución final, todo sin apartarse de la prueba presentada y admitida en juicio y sin dar más énfasis a un evento que a otro. *Pueblo v. Acevedo Estrada,* supra; *Pueblo v. Echevarría Rodríguez I,* supra; *Pueblo v. Rodríguez Esmurria,* 90 DPR 532 (1964).

Con relación al ámbito normativo, la instrucción impartida al jurado debe proveer para que se cubran todos los elementos esenciales del delito imputado, así como los de aquellos inferiores comprendidos en el mismo y todos los aspectos de derecho que, bajo cualquier teoría razonable, resulten ser pertinentes a las deliberaciones, aunque la prueba de defensa sea débil, inconsistente o de dudosa credibilidad. *Pueblo v. Rosario,* 160 DPR 592 (2003); *Pueblo v. Acevedo Estrada,* supra; *Pueblo v. Miranda Santiago,* 130 DPR 507 (1992); *Pueblo v. Bonilla Ortiz,* 123 DPR 434

(1989). Por su parte, el profesor Chiesa Aponte señala que el juez o la jueza tiene discreción para denegar la instrucción si estima que el derecho penal sustantivo no la sostiene. E. L. Chiesa Aponte, *Procedimiento Criminal y La Constitución: Etapa Adjudicativa*, San Juan, Ed. SITUM, 2018, pág. 503. Por tanto, si la evidencia resulta insuficiente en derecho para establecer la comisión del delito, el juez o la jueza podrá denegar la instrucción. *Pueblo v. Negrón Ayala*, supra, pág. 415. La solicitud de la instrucción será evaluada de la manera más favorable para la persona acusada. Chiesa Aponte, *op. cit.*, pág. 503.

En cuanto a los delitos inferiores comprendidos en el delito imputado, el Tribunal Supremo de Puerto Rico ha establecido que estas no se impartirán de forma automática, sino que es necesario que exista evidencia sobre la cual el jurado pueda inferir razonablemente que la persona acusada es culpable del delito inferior. *Pueblo v. Negrón Ayala*, supra. "Aun cuando esa evidencia sea escasa o débil, la misma debe apreciarse por el jurado y no por la corte". *Pueblo v. Serbiá*, 75 DPR 394, 398 (1953). Así, pues, el fundamento para impartir la instrucción al jurado sobre un delito menor incluido estriba en que esté apoyada en prueba que así la justifique. *Íd.* De este modo, en los casos en que se solicite una instrucción por asesinato atenuado (antes homicidio),[182] si "claramente aparece demostrado por la prueba que no se trata de un delito de homicidio sino de un asesinato, no tiene necesidad el juez [o la jueza] de dar instrucciones referentes al delito de homicidio". *Pueblo v. Rodríguez*, 34 DPR 464 (1925); *Pueblo v. Rosario*, supra.

La prueba que justifica la instrucción para el delito menor incluido es aquella que "de ser creída por el jurado, sería suficiente

---

[182] Antes de las enmiendas incorporadas mediante la Ley Núm. 246-2014, el delito de asesinato atenuado se conocía como "homicidio". Ley Núm. 146-2012.

como cuestión de derecho penal sustantivo, para que [la persona] el acusad[a] prevalezca. El juez [o la jueza] no debe aquí hacer juicio de credibilidad alguno para no impartir la instrucción, pues estaría usurpando funciones del jurado, en violación al derecho constitucional [de la persona] acusad[a] a juicio por jurado". *Pueblo v. Negrón Ayala,* supra, págs. 415–416, citando a E.L. Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos,* Colombia, Ed. Forum, 1992, Vol. II, pág. 332.

En cuanto a la instrucción sobre intoxicación voluntaria, nuestro Tribunal Supremo ha señalado que esta deberá "ser transmitida al jurado cuando ante [e]ste ha desfilado prueba tendiente a demostrar la intoxicación [de la persona] acusad[a] al tiempo de cometer el delito y antes de ello". *Pueblo v. Sánchez Vega,* 97 DPR 133, 143 (1969). Por tanto, la persona acusada deberá demostrar que se encontraba en estado de embriaguez al momento de cometer el delito. *Pueblo v. Febres,* 78 DPR 893, 899 (1956).

Por igual, los miembros del jurado deben ser adecuadamente advertidos sobre la carga probatoria requerida para establecer la comisión del delito objeto del procedimiento, así como la forma de culpabilidad exigida; a saber, el aspecto de intención o de negligencia, según sea el caso, puesto que deben determinar la presencia de los elementos subjetivos del actor. *Pueblo v. Rosario,* supra; *Pueblo v. Bonilla Ortiz,* supra.

Ahora bien, consideraciones relativas a la uniformidad en la administración de la justicia y al ideal de minimizar todo grado de error posible en las instrucciones que se transmiten a los miembros del jurado, fundamentan la doctrina que establece que, la mejor práctica de los tribunales de instancia es basar sus instrucciones en el Manual de Instrucciones al Jurado. *Pueblo v. Mangual Hernández,* 111 DPR 136 (1981). Lo anterior también fomenta el que los miembros del jurado no queden expuestos a instrucciones largas

o repetitivas, y sí a aquellas que se ajusten a la ley. *Pueblo v. Velázquez Caraballo,* 110 DPR 369 (1980).

Nuestro Tribunal Supremo ha destacado que existe una presunción de corrección cuando las instrucciones impartidas al jurado no fueron objetadas en su momento por la defensa. *Pueblo v. Jiménez Hernández,* 116 DPR 632 (1985). Es decir, que la falta de objeción "resulta en una garantía adicional de que todos los señores [y las señoras] del jurado que intervinieron en el proceso de deliberación [...] emitieron sus votos con una correcta percepción y entendimiento del derecho aplicable al mismo". *Íd.,* págs. 638-639. Además, el no objetar oportunamente constituye una renuncia a levantar dichas instrucciones como error en apelación. *Pueblo v. Ortiz González,* 111 DPR 408, 410, 412 (1981). Sobre ese particular, nuestro más Alto Foro ha resuelto que "es tardío un planteamiento en apelación impugnando las instrucciones del juez [o la jueza] al jurado cuando la defensa no objeta dichas instrucciones ni solicita instrucciones adicionales". *Pueblo v. Romero Cuesta,* 101 DPR 404, 408 (1973), citando a *Pueblo v. Torres Rolón,* 99 DPR 970 (1971). Incluso, si no objeta de carácter general las instrucciones transmitidas, se renuncia a los errores que no lesionen derechos fundamentales. *Pueblo v. Del Valle,* 91 DPR 174 (1964). Añadimos que, se vulnera la garantía fundamental de un juicio justo cuando el tribunal no imparte una instrucción solicitada por la defensa sobre el delito de homicidio voluntario, y la misma está justificada en la evidencia. *Pueblo v. González Colón,* supra. Por tanto, el efecto será la revocación de la sentencia apelada y la celebración de un nuevo juicio. *Íd.*

### C

De conformidad con lo expresamente estatuido en el Artículo 92 del Código Penal de 2012, el delito de asesinato se define como "dar muerte a un ser humano a propósito, con conocimiento o

temerariamente". 33 LPRA sec. 5142. El elemento objetivo del delito de asesinato es dar muerte a un ser humano; mientras que el elemento subjetivo, es cuando la persona actúa a propósito, con conocimiento o temerariamente. D. Nevares Muñiz, *Código Penal de Puerto Rico Comentado*, 4ta ed. rev., San Juan, SITUM, 2019, pág. 149-150. Asimismo, el Artículo 22 (1)(a) del Código Penal de 2012 señala que, "una persona actúa 'a propósito' cuando su objetivo consciente es la producción de dicho resultado". 33 LPRA sec. 5014. A su vez, una persona actúa con conocimiento "cuando está consciente de que la producción del resultado es una consecuencia prácticamente segura de su conducta". Artículo 22 (2)(a) del Código Penal de 2012, *supra*.

Según la profesora Dora Nevárez Muñiz, la Ley Núm. 246-2014 que enmendó el Código Penal de 2012, flexibilizó los requisitos para probar el asesinato en primer grado, puesto que se sustituyó el elemento de premeditación y deliberación por los elementos de "a propósito" o "con conocimiento". Nevares Muñiz, *op. cit.*, págs. 153-155; Véase, además, F. M. Pacheco Camacho, *Enmiendas al Código Penal 2012: Cambios al Elemento de Intención Criminal*, 55 Rev. Der P.R. 41 (2015). En ese sentido, bajo el elemento de deliberación y premeditación se requería que el acto fuera pensado de antemano; es decir, que se llegara a la intención de matar luego de alguna consideración. *Pueblo v. Concepción Guerra*, 194 DPR 291, 305 (2015). No obstante, no era necesario un intervalo de tiempo determinado entre la intención de matar y el acto de matar, por lo que el delito de asesinato en primer grado podía formarse sin la deliberación del acto. *Íd*. De este modo, con los elementos de "a propósito" o "con conocimiento", ya no es necesario probar la deliberación previa a la resolución de matar. Nevares Muñiz, *op. cit.*; F. M. Pacheco Camacho, *supra*. Ante ello, se hace más comprensible la instrucción que se imparta al jurado sobre el elemento mental. *Íd*.

A fin de exponer los grados de asesinato reconocidos en nuestro ordenamiento penal, el Artículo 93 del Código Penal de 2012, 33 LPRA sec. 5142 (d), reza como sigue:

Constituye asesinato en primer grado:

(a) Todo asesinato perpetrado por medio de veneno, acecho, tortura, o a propósito o con conocimiento.

[...]

Cónsono con el precitado artículo, se considera que una persona actúa "a propósito" cuando "el objetivo consciente o finalidad de su conducta es llevar a cabo el resultado prohibido por ley [...] o cuando cree que la circunstancia existe". D. Nevares Muñiz, *Código Penal de Puerto Rico*, Ed. 2015, Instituto para el Desarrollo del Derecho, Inc., San Juan, pág. 46. Por lo que, cuando el Estado sostiene que el acto se cometió "a propósito", deberá probar que la persona acusada conscientemente quería incurrir en la conducta, **como el acto de apuntar o disparar un arma**; o la persona acusada conscientemente quería causar el resultado, como el daño o la muerte de la víctima. *Íd.* De otro lado, una persona actúa "con conocimiento" cuando "la existencia de la circunstancia o del resultado es una prácticamente segura [que] se refiere a una probabilidad muy alta". *Íd.* En ese sentido, si se imputa la comisión al amparo de esta modalidad, el Estado tiene que establecer que la persona acusada estaba consciente que el resultado o el daño se produciría. *Íd.*

Por otro lado, el Artículo 95 del Código Penal de 2012 establece que el asesinato atenuado es: "Toda muerte causada a propósito, con conocimiento o temerariamente, que se produce como consecuencia de una perturbación mental o emocional suficiente para la cual hay una explicación o excusa razonable o súbita pendencia, será sancionada con pena de reclusión por un término fijo de quince (15) años". 33 LPRA sec. 5144. Se trata de un delito

menor incluido bajo la modalidad de asesinato en primer grado. E. L. Chiesa Aponte, *Derecho Procesal Penal*, 84 Rev. Jur. U.P.R. 665, 677 (2015).

Surge del citado artículo que los elementos del delito son: (1) dar muerte a un ser humano (2) a propósito, con conocimiento o temerariamente. Nevares Muñiz, *op. cit.*, págs. 160-161. Sin embargo, dicho articulado permite atenuar la pena "por razón de que la muerte es consecuencia de una súbita pendencia o de una perturbación mental o emocional suficiente para la cual hay una explicación o excusa razonable". *Íd.*, pág. 161.

En *Pueblo v. Guadalupe Rivera*, 206 DPR 616, 633–634 (2021), el Tribunal Supremo de Puerto Rico se expresó sobre la vigencia de las interpretaciones del delito de homicidio bajo la legislación previa al Código Penal de 2012. En particular, puntualizó que:

> El Art. 95 del Código Penal de Puerto Rico de 2012 [...] tipifica el delito de asesinato atenuado. Esta disposición penal establece que el delito se comete por "[t]oda muerte causada a propósito, con conocimiento o temerariamente, que se produce como consecuencia de una perturbación mental o emocional suficiente para la cual hay una explicación o excusa razonable o súbita pendencia [...]". Como consecuencia, el delito se consuma al incurrir en un acto intencional —con propósito, conocimiento o temerariamente— que causa la muerte a otra, pero, por existir circunstancias atenuantes importantes, el delito y la pena cambian en beneficio [de la persona] acusad[a]. En otros términos, se modifica el delito y la pena a favor [de la persona] acusad[a] por las circunstancias que disipan la gravedad de la conducta, pues, sin estas, la persona incurriría en el delito de asesinato en primer grado o asesinato [en] segundo grado.
>
> En *Pueblo v. Negrón Ayala*, [...] en el contexto de las frases "súbita pendencia" y "arrebato de cólera", señalamos que "la circunstancia atenuante consiste en que el acto [de la persona] acusad[a] *fue una reacción irreflexiva, pasional, súbita e inmediata, provocada por la víctima u otra persona actuando con [e]sta*". En virtud de la definición de *homicidio* que contenía el Código Penal de 1974, expresamos que "[e]l homicidio presupon[ía] que [la persona] autor[a] de la muerte actuó movid[a] por una provocación adecuada de tal naturaleza que lleve a una persona ordinaria a perder su dominio y actuar según sus impulsos mentales

KLAN202200243                                                                41

causados por la cólera, pendencia o emoción violenta". Aclaramos, además, que "la sed de venganza nunca ser[ía] suficiente para catalogar el delito como un homicidio". Dado a que el delito de asesinato atenuado requiere una "perturbación mental o emocional suficiente para la cual hay una explicación o excusa razonable o súbita pendencia" [...], **estos principios siguen vigentes**. *Pueblo v. Guadalupe Rivera*, supra. (Citas omitidas) (Énfasis original).

Nuestro más Alto Foro ha identificado factores para determinar la posible comisión de homicidio, a saber: (1) que la muerte haya ocurrido mientras la persona actora se encontraba en un arrebato de cólera o de pendencia súbita; (2) que la muerte esté precedida de una provocación adecuada, y (3) que la muerte ha ocurrido antes de que el arrebato o pendencia sufrida por la persona actora se hubiere razonablemente "enfriado". *Pueblo v. Negrón Ayala*, supra, pág. 418.

Sobre este particular, la profesora Dora Nevares Muñiz ha enfatizado que, bajo el texto vigente, los factores de provocación y enfriamiento se flexibilizaron. Nevares Muñiz, *op. cit.*, págs. 161-162. Sin embargo, estos siguen siendo elementos para tomar en consideración a la hora de determinar si ocurrió el asesinato atenuado. *Íd.*

Ahora bien, el Tribunal Supremo de Puerto Rico ha aclarado que no es homicidio cuando la agresión se dirige contra un bebé que lloraba mientras los padres discutían. *Pueblo v. López Rodríguez*, 101 DPR 897 (1974). En esa ocasión, el Alto Foro señaló: "El hecho de que [de la persona] acusad[a] le diera coraje y aun cuando estuviera 'rabios[a]' porque su concubina l[a] mandó a buscar unos baldes de agua[,] no es suficiente para que un[a] [persona] de temperamento corriente pierda el dominio de s[í] mism[a], se ensañe contra una indefensa niña, que es su propia hija y la azote violentamente contra el suelo hasta ocasionarle la muerte". *Íd.*, pág. 900. De este modo, el Foro de última instancia confirmó la sentencia que declaró culpable a López Rodríguez por asesinato en primer

grado. *Íd.* No obstante, se acepta la defensa de asesinato atenuado cuando por error de hecho se dirige la agresión contra un tercero. Nevares Muñiz, *op. cit.*, pág. 162, citando *a Pueblo v. López Rivera*, 109 DPR 160 (1979).

**D**

El Código Penal de 2012 define la tentativa en su Artículo 35, como sigue:

> Existe tentativa cuando la persona actúa con el propósito de producir el delito o con conocimiento de que se producirá el delito, y la persona realiza acciones inequívoca e inmediatamente dirigidas a la consumación de un delito que no se consuma por circunstancias ajenas a su voluntad. 33 LPRA sec. 5048.

Para que se constituya la tentativa, el Código Penal de 2012 exige que: (1) se realice una acción u omisión; (2) que esta sea a propósito o con conocimiento y de forma inequívoca, es decir, que sin lugar a duda se cometerá el delito que no llegó hasta su estado de consumación; (3) que debe constituir la fase inmediatamente anterior a la consumación del acto exigido por el tipo; y (4) un resultado que no se ha verificado o consumado por causas ajenas a la voluntad de la persona actora. Nevares Muñiz, *op. cit.*, págs. 75-76; Véase, además, D. Nevares Muñiz, *La Tentativa de Delito en el Código Penal de 2004: Figura de Convergencia*, 43 Rev. Jur. U.I.P.R. 371 (2009).

**E**

Por su parte, el Artículo 42 del Código Penal de 2012 dispone lo siguiente:

> La voluntaria intoxicación por drogas, sustancias narcóticas, estimulantes o deprimentes, o sustancias similares no es admisible para establecer que la persona se encontraba en un estado de inimputabilidad o para negar que la persona intoxicada actuó temerariamente o negligentemente. No obstante, un estado de intoxicación voluntaria es admisible para negar que la persona intoxicada actuó a propósito o con conocimiento. 33 LPRA sec. 5065.

Según este artículo, se prohíbe el uso de la intoxicación voluntaria para negar "temeridad" y "negligencia"; empero, se permite para negar "a propósito" o "con conocimiento". Nevares Muñiz*, op. cit.*, pág. 87. Asimismo, la embriaguez "tiene que ser de tal grado o carácter que inhiba en [la persona] acusad[a] su facultad mental para formar la intención específica requerida por el Código para la convicción de un delito —o grado del mismo— en el cual se requiera tal intención específica, y que la determinación de ese hecho es esencialmente una para el jurado o la corte juzgadora". *Pueblo v. Robles González*, 132 DPR 554, 562 (1993); *Pueblo v. Méndez Ramos*, 108 DPR 59, 62 (1978); *Pueblo v. Rivera*, 70 DPR 570, 573-574 (1949). En ese sentido, bajo el Código Penal de 2012, la intoxicación voluntaria solo podrá alegarse para reducir el delito de asesinato en primer grado a uno de asesinato en segundo grado. Nevares Muñiz, *op. cit.*, pág. 88.

Nuestra Alta Curia ha señalado que la mera prueba de embriaguez no suficiente para rebajar los grados del delito. *Pueblo v. Méndez Ramos*, supra, pág. 62. Así, pues, prueba de que la persona se había dado un par de tragos o de que se había fumado un cigarrillo de marihuana no es suficiente para rebajar la clasificación del delito. Nevares Muñiz, *op. cit.*, pág. 87, citando a *Pueblo v. Caballero Rodríguez*, supra; Véase, además, *Pueblo v. Delgado Lafuente*, 97 DPR 266 (1969).

**F**

Surge de la Exposición de Motivos de la Ley de Armas de 2000*, supra,* que el propósito principal de su aprobación fue lograr una solución efectiva al problema del control de armas de fuego en manos de delincuentes en Puerto Rico. *Cancio, Ex parte*, 161 DPR 479 (2004).[183] Esta legislación responde al interés apremiante del

---

[183] La Ley Núm. 168-2019, según enmendada, conocida como *Ley de Armas de Puerto Rico 2020*, derogó la Ley de Armas de 2000. Sin embargo, en este caso, por

Gobierno de Puerto Rico de ser más efectivo en la lucha contra el crimen. *Íd.* Por un lado, el estatuto orienta a las personas autorizadas en Puerto Rico a manejar responsablemente sus armas de fuego. Por otro lado, apercibe al delincuente de las serias consecuencias de incurrir en actos criminales utilizando armas de fuego. Por último, crea un sistema de registro electrónico con el fin de facilitar la inscripción de todas las transacciones de armas de fuego y municiones que los concesionarios de licencias de armas realicen en Puerto Rico. *Íd.*

Por su parte, la Ley Núm. 137-2004 enmendó sustancialmente la Ley de Armas de 2000. De la exposición de motivos surge que las enmiendas respondieron a un interés por fortalecer los mecanismos que tiene a su alcance el sistema judicial y para corregir lagunas que permitan penalizar severamente al delincuente que hace mal uso de su licencia de armas o al que utiliza armas y municiones ilegales.

El Artículo 5.04 de la Ley de Armas de 2000, regulaba la portación y uso de armas de fuego sin licencia. En lo pertinente, disponía que:

> Toda persona que transporte cualquier arma de fuego o parte de [e]sta, sin tener una licencia de armas, o porte cualquier arma de fuego sin tener su correspondiente permiso para portar armas, incurrirá en delito grave y convicta que fuere, será sancionada con pena de reclusión por un término fijo de diez (10) años. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de veinte (20) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de cinco (5) años.
>
> [...]
>
> Se considerará como atenuante cuando el arma esté descargada y la persona no tenga municiones a su alcance. Además, se considerará como atenuante del delito establecido en el primer párrafo de este Artículo que no exista prueba de la intención de cometer delito.
>
> Se considerará como agravante cualquier situación en la que el arma ilegal se utilice en la comisión de

---

tratarse de hechos ocurridos en el año 2018, es de aplicación la Ley de Armas del 2000.

cualquier delito o su tentativa...25 LPRA sec. 458(c). (Supl. 2019).

Con respecto al delito de apuntar y disparar, el Artículo 5.15 de la Ley de Armas de 2000, 25 LPRA sec. 458n, decretaba lo siguiente:

(a) Incurrirá en delito grave con pena de reclusión por un término fijo de cinco (5) años, toda persona que, salvo en casos de defensa propia o de terceros, o de actuaciones en el desempeño de funciones oficiales o actividades legítimas de deportes:

(1) Voluntariamente dispare cualquier arma en un sitio público o en cualquier otro sitio donde haya alguna persona que pueda sufrir daño, aunque no le cause daño a persona alguna, o

(2) intencionalmente, aunque sin malicia, apunte hacia alguna persona con un arma, aunque no le cause daño a persona alguna.

[...]

Por su parte, la Ley de Armas de 2000 incluía un artículo sobre el agravamiento de las penas respondiendo a un interés apremiante del Estado de crear un disuasivo efectivo con serias consecuencias para el delincuente que incurriera en actos delictivos mediante el uso de armas de fuego. En específico, el Artículo 7.03 de la Ley de Armas de 2000, establecía que:

Toda persona que resulte convicta de alguna de las disposiciones de este capítulo, y que dicha convicción esté asociada y sea coetánea a otra convicción de cualquiera de las disposiciones de las secs. 2101 et seq. del Título 24, conocidas como la "Ley de Sustancias Controladas de Puerto Rico", con excepción de su sec. 2404, o de las secs. 971 *et seq.* de este título, conocidas como la "Ley contra el Crimen Organizado y Lavado de Dinero del Estado Libre Asociado de Puerto Rico", será sancionada con el doble de la pena dispuesta en este capítulo.

Todas las penas de reclusión que se impongan bajo esta Ley serán cumplidas consecutivamente entre sí y consecutivamente con las impuestas bajo cualquier otra ley. Además, si la persona hubiere sido convicta anteriormente por cualquier violación a esta Ley o por cualquiera de los delitos especificados en el Artículo 2.11 de esta Ley o usare un arma en la comisión de cualquier delito y como resultado de tal violación alguna persona sufriera daño físico o mental, la pena establecida para el delito se duplicará. 25 LPRA sec. 460b.

Sobre este particular, la profesora Dora Nevares Muñiz comenta que el referido Artículo 7.03 excluía el concurso con el Código Penal. Específicamente expone que:

> En este caso el [A]rt. 7.03 de la Ley de Armas dispone para la imposición de penas consecutivas entre sí y con cualquier otra ley. Este es un ejemplo de una excepción al concurso establecida por el legislador. En este caso se impondrá la pena que corresponda bajo el Código Penal y la pena por la Ley de Armas se cumplirá de forma consecutiva con esa pena. D. Nevares, *Derecho Penal Puertorriqueño*, 6ta ed. rev., San Juan, Ed. Inst. Desarrollo del Derecho, 2005, págs. 389-390.

El Artículo 7.03 de la Ley de Armas de 2000, *supra,* ha sido interpretado por el Tribunal Supremo de Puerto Rico a los únicos fines de resolver que "[l]as penas carcelarias dispuestas en la Ley de Armas se impondrán de forma consecutiva a cualquier otra sentencia". *Pueblo v. Bonilla Peña,* 183 DPR 335, 352 (2011).

Por tanto, nuestro más Alto Foro no aplicó la figura de concurso de delitos contenida en el Artículo 79 del Código Penal de 2004, 33 LPRA sec. 4707, sino que amparándose en el Artículo 7.03 de la Ley de Armas de 2000, *supra,* ratificó las penas impuestas por cada cargo de infracción al referido estatuto a ser cumplidas consecutivamente. En vista de que el citado Artículo 7.03 disponía que las penas debían cumplirse consecutivamente, esto expresamente descartaba la aplicabilidad de la figura del concurso de delitos para este tipo de casos.

Cabe señalar, además, que el Artículo 6.14 de la Ley Núm. 168-2019, según enmendada, conocida como la nueva *Ley de Armas de Puerto Rico de 2020*, 25 LPRA sec. 466m (Ley de Armas de 2020) sobre apuntar y disparar armas de fuego, proviene del Artículo 5.15 de la derogada Ley de Armas de 2000. Véase, A. Bermúdez Torres, *Delitos Especiales en Puerto Rico: Análisis de los Tipos Delictivos, Interrogatorios y Testimonios de Base,* Bayamón, LexJuris de Puerto Rico, 2022, págs. 72-75. En cuanto al concurso de delitos bajo el

Artículo 6.14 de la Ley de Armas de 2020 y el Artículo 93 del Código Penal 2012, Bermúdez Torres ha señalado que:

> [L]a modalidad de Asesinato en Primer Grado se produce cuando se ocasiona la muerte de una persona como resultado de disparar un arma de fuego desde un vehículo de motor, o en un lugar público o abierto al público, ya sea a un punto determinado o indeterminado. Nótese que el aludido Art. 93 (d) contiene todos los elementos constitutivos de la modalidad tipificada en [el] inciso (a) del Art. 6.14 de la Ley de Armas, con el elemento adicional de que se ocasiona la muerte a otra persona. No habiendo conflicto entre ambas disposiciones penales, y prohibido el concurso de delitos bajo la Ley de Armas, además de poder procesarse por ambas disposiciones, sus convicciones obligan a imponer penas por ambas y de forma consecutiva. Bemúdez Torres, *op. cit.*, pág. 75.

La figura de concurso de disposiciones penales está contenida en el Artículo 9 del Código Penal de 2012, 33 LPRA sec. 5009, el cual establece las normas de interpretación para la materia que es regulada por distintas disposiciones penales. Nevares Muñiz, *op. cit.*, pág. 19. Dicho artículo dispone que:

> Cuando la misma materia se regula por diversas disposiciones penales:
>
> (a) La disposición especial prevalece sobre la general.
>
> (b) La disposición de mayor alcance de protección al bien jurídico absorberá la de menor amplitud, y se aplicará la primera.
>
> (c) La subsidiaria aplicará s[o]lo en defecto de la principal, si se declara expresamente dicha subsidiaridad, o [e]sta se infiere. 33 LPRA sec. 5009.

Así, pues, el inciso (a) del precitado Artículo 9 adopta la norma de interpretación de especiales, en donde se aplicará la disposición más especial, excepto cuando por legislación se disponga lo contrario. *Pueblo v. Hernandez Villanueva*, 179 DPR 872 (2010); Nevares Muñiz, *op. cit.*, pág. 19. Por otro lado, el inciso (b) del referido artículo recoge la norma de interpretación en cuanto a la consunción de disposiciones penales.

A la luz de la normativa antes expuesta, procedemos a disponer de las controversias ante nuestra consideración.

**III**

Ortega Vázquez señala como primer error que el Tribunal de Primera Instancia incidió al no impartir la instrucción sobre intoxicación voluntaria del Artículo 42 del Código Penal de 2012, *supra*, y los delitos menores incluidos, aun cuando en el juicio desfiló prueba de que este se encontraba "borracho" y "bien tomado". Como segundo error señalado, aduce que el foro primario erró al no impartir al jurado la instrucción de asesinato atenuado y agresión grave atenuada, toda vez que la prueba de cargo demostró que la parte apelante sostuvo una discusión antes de los hechos, la cual pudo haber provocado una perturbación mental o emocional suficiente para la cual había una explicación. Por otro lado, como tercer señalamiento de error, plantea que procede revocar las seis (6) sentencias por infracción al Artículo 5.15 de la Ley de Armas de 2000, *supra*, bajo el fundamento de concurso de disposiciones penales, debido a que estas fueron absorbidas por el delito de asesinato en primer grado y las tentativas de asesinato del Código Penal de 2012. Como cuarto señalamiento de error, arguye que procede revocar las sentencias emitidas en los casos DVI2019G001 y DLA2019G0033 por los delitos de tentativa de asesinato y apuntar con un arma de fuego hacia Rivera Espinell, esto debido a que no se estableció más allá de duda razonable que Ortega Vázquez apuntara ni disparara hacia este. Por último, como quinto error, sostiene que procede revocar la *Sentencia* del caso DVI2019G005 debido a que la prueba no fue satisfactoria para probar que actuó "a propósito" o "con conocimiento" al disparar contra Helmis Cintrón.

En esencia, Ortega Vázquez plantea en su primer error que había prueba suficiente como cuestión de derecho sobre intoxicación voluntaria para rebajar la calificación de asesinato en primer grado, así como las tentativas de asesinato, a delitos menores incluidos. En específico, señala que Cintrón Millán testificó que lo

vio pedir una cerveza en la barra y admitió mediante declaración jurada que este estaba borracho. Asimismo, arguye que Cintrón Cruz indicó mediante declaración jurada que Ortega Vázquez se encontraba en la barra, consumiendo cerveza, se veía "bien tomado", "hablaba con dificultad y tenía la lengua pesada". Evaluados los planteamientos esbozados, colegimos que esta evidencia por sí sola no era suficiente en derecho para que la Jueza de instancia impartiera la instrucción al jurado sobre intoxicación voluntaria. Nos explicamos.

Como reseñamos previamente, el tribunal sentenciador tiene el deber de impartir aquellas instrucciones de delitos inferiores comprendidos en el delito imputado, y todos los aspectos de derecho que, bajo cualquier teoría razonable, resulten ser pertinentes a las deliberaciones, aunque la prueba de defensa sea débil, inconsistente o de dudosa credibilidad. Ahora bien, dicha instrucción no procede automáticamente. En ese sentido, es necesario que exista evidencia suficiente como cuestión de derecho penal sustantivo y sobre la cual el jurado pueda inferir razonablemente que la persona acusada es culpable del delito inferior. También es necesario que la parte solicite expresamente que se imparta la instrucción que entiende necesaria. El no hacerlo oportunamente, acarrea que renuncie a levantarlo como error en alzada.

En el caso de autos, la instrucción sobre intoxicación voluntaria nunca fue solicitada por la representación legal de Ortega Vázquez. Ante ese escenario, conforme a nuestro ordenamiento jurídico, la parte apelante está impedida de levantar tal error en apelación y, por tanto, resulta inoficioso expresarnos al respecto. Por otro lado, la defensa no presentó prueba a esos efectos. Las meras conclusiones de los testigos que atribuyeron a Ortega Vázquez estar borracho, no son suficientes en derecho para que el foro sentenciador estuviera compelido a impartir la correspondiente

instrucción. Por tanto, el primer señalamiento de error no se cometió.

Por otro lado, como segundo señalamiento de error, la parte apelante plantea que procedía la instrucción sobre asesinato atenuado, toda vez que la prueba de cargo tendió a demostrar que Ortega Vázquez actuó bajo un estado mental de perturbación mental o emocional suficiente. Surge de los autos originales que la instrucción sobre asesinato atenuado fue solicitada por la defensa en la vista de *Status Conference* celebrada el 1 de julio de 2021. No obstante, la misma fue denegada por el foro *a quo* bajo el fundamento de que hubo un periodo de "enfriamiento" donde debía haber una reflexión por parte de Ortega Vázquez.

En cuanto a la instrucción al jurado por asesinato atenuado, el fundamento para impartirla estriba en que esté apoyada en prueba que así la justifique, aun cuando esta sea débil o inconsistente. De este modo, si claramente aparece demostrado por la prueba que no se trata de un delito de asesinato atenuado, sino de un asesinato, el juez o la jueza de instancia no tiene la necesidad de impartir la instrucción sobre dicho delito. Es decir, la instrucción será denegada cuando el derecho penal sustantivo no la sostenga. Ante ello, en el caso de autos, nos corresponde determinar si, a la luz de la prueba desfilada en el juicio por jurado, procedía la instrucción de asesinato atenuado.

La parte apelante sostiene que, entre las enmiendas que introdujo la Ley Núm. 246-2014 al Código Penal de 2012, se encuentra la sustitución del arrebato de cólera por perturbación mental o emocional suficiente en los casos de asesinato atenuado del Artículo 95 de Código Penal de 2012, *supra*. Añade que dicho cambio proviene del Código Modelo Penal, por lo que la intención legislativa fue impartir mayor amplitud a la modalidad de "atenuado". Asimismo, cita a la profesora Dora Nevares Muñiz,

quien señala que, con las enmiendas introducidas, se flexibilizaron los requisitos para atenuar la pena en los casos en que la muerte se produce como consecuencia de una perturbación mental o emocional suficiente para la cual hay una explicación suficiente. Por tanto, la parte apelante —apoyándose en la interpretación de la referida profesora— sostiene que el asesinato atenuado no está sujeto a la rigidez de la vieja doctrina sobre provocación ni el periodo de enfriamiento, cuyo fundamento utilizó el foro apelado para no impartir la instrucción solicitada. No le asiste la razón.

Si bien es cierto que en nuestro ordenamiento jurídico los tratadistas tienen valor persuasivo, estos no son fuente de derecho. En ese sentido, la parte apelante obvió citar la norma establecida en *Pueblo v. Guadalupe Rivera*, supra. En ese caso, nuestro Tribunal Supremo tuvo la oportunidad de expresarse sobre el Artículo 95 del Código Penal de 2012, *supra*, de la siguiente manera:

> En *Pueblo v. Negrón Ayala*, [...] en el contexto de las frases "súbita pendencia" y "arrebato de cólera", señalamos que "la circunstancia atenuante consiste en que el acto [de la persona] acusad[a] fue una reacción irreflexiva, pasional, súbita e inmediata, provocada por la víctima u otra persona actuando con [e]sta". En virtud de la definición de homicidio que contenía el Código Penal de 1974, expresamos que "[e]l homicidio presupon[ía] que [la persona] autor[a] de la muerte actuó movid[a] por una provocación adecuada de tal naturaleza que lleve a una persona ordinaria a perder su dominio y actuar según sus impulsos mentales causados por la cólera, pendencia o emoción violenta". Aclaramos, además, que "la sed de venganza nunca ser[ía] suficiente para catalogar el delito como un homicidio". **Dado a que el delito de asesinato atenuado requiere una "perturbación mental o emocional suficiente para la cual hay una explicación o excusa razonable o súbita pendencia" [...] estos principios siguen vigentes**. *Pueblo v. Guadalupe Rivera*, supra. (Citas omitidas). (Énfasis nuestro).

De lo antes citado, quedó establecido por nuestro más Alto Foro que todavía continúa vigente la doctrina sobre la provocación adecuada. Además, el Foro de última instancia citó con aprobación a *Pueblo v. Negrón Ayala*, supra. Este último establecía que, para

que se probara la comisión de homicidio (ahora asesinato atenuado), debían identificarse los siguientes factores: (1) que la muerte haya ocurrido mientras la persona actora se encontraba en un arrebato de cólera o de pendencia súbita; (2) que la muerte esté precedida de una provocación adecuada, y (3) que la muerte ha ocurrido antes de que el arrebato o pendencia sufrida por la persona actora se hubiere razonablemente "enfriado". De este modo, dichos factores siguen vigentes y deben ser tomados en consideración a la hora de determinar si ocurrió el asesinato atenuado. Incluso, la propia profesora Dora Nevares Muñiz apunta a que se flexibilizaron los elementos, no que estos fueron abandonados.

Surge del expediente ante nuestra consideración que fue Ortega Vázquez quien, (1) solicitó hablar con Cintrón Millán afuera del negocio El Escondite; (2) llamó a Cintrón Millán por su nombre y este último le contestó "¿qué fue?"; (3) respondió que tenía que hablar con él aparte; (4) se movieron cerca de la grúa y Cintrón Millán le preguntó nuevamente "¿qué fue?"; (5) le contestó que "qué carajo pasó" en el negocio del Vagón, en donde le había solicitado una canción de karaoke y que nunca puso; (6) lo referente al evento del Vagón había ocurrido hacia dos meses; (7) Cintrón Millán le indicó que le había puesto la canción y que este nunca se paró para cantarla; (8) le indicó a Cintrón Millán que su karaoke no servía; (9) Cintrón Millán le dijo que no estaba para esa ignorancia ni para problemas, que dejaran las cosas ahí, que no quería saber más de él.[184]

Durante el directo de Cintrón Millán, este añadió que Ortega Vázquez se le quedó mirando y le contestó que no le tenía miedo, a lo que este último, molesto, le ripostó que él tampoco le tenía miedo y le dijo "pendejo".[185] Surge de la transcripción de la prueba oral que

---

[184] TPO, págs. 20-22.
[185] Íd., pág. 22.

Cintrón Millán aclaró que se quedó parado para ver cómo iba a reaccionar Ortega Vázquez, pero este no hizo nada.[186] Así, pues, según su testimonio, Cintrón Millán le dijo: "Albert[o], vamos a dejar las cosas aquí[.] [N]o quiero hablar más contigo"; "No quiero saber más de ti".[187] Cintrón Millán continuó relatando que, en ese momento, Ortega Vázquez se fue del negocio en la grúa hasta su casa.[188] Declaró que, mientras tanto, él se quedó hablando con Mayra Pintado por espacio de diez (10) minutos, y luego se fue al baño.[189] Añadió que, cuando salió del baño del negocio, se percató que Ortega Vázquez había regresado y lo vio sacar un arma y comenzar a disparar.[190]

Por otro lado, en el contrainterrogatorio de Cintrón Millán, este admitió que no incluyó en su declaración jurada que, en el momento en que él y Ortega Vázquez salieron a hablar, este último le dijo de forma molesta "qué carajo pasó".[191] A cuestionamientos de la defensa, afirmó que tampoco incluyó en dicho escrito que Ortega Vázquez lo estuviera amenazando, ni que haya sentido miedo, porque le iba a tirar un puño.[192] De igual modo, Cintrón Millán expresó que, según su declaración jurada, le dijo "molesto" a Ortega Vázquez que no era amigo suyo.[193] De otra parte, en el redirecto, aclaró que, cuando le dijo a Ortega Vázquez que le puso la canción del karaoke, este se alteró y le dijo de forma arrogante y riéndose que su karaoke no servía.[194]

Si bien es cierto que la parte apelante solicitó oportunamente la instrucción sobre asesinato atenuado, esta no procedía en derecho. No encontramos en los testimonios que haya ocurrido una

---

[186] TPO, pág. 22.
[187] Íd.
[188] Íd., págs. 22-23.
[189] Íd., pág. 23.
[190] Íd., págs. 24-25.
[191] Íd., pág. 66.
[192] Íd., pág. 69.
[193] Íd., págs. 71-72.
[194] Íd., pág. 82.

provocación adecuada para que se cumpliera con los elementos de asesinato atenuado ni mucho menos la suficiencia requerida para que procediera impartir la instrucción solicitada. Surge del testimonio de Cintrón Millán que fue Ortega Vázquez quien solicitó hablar con él. Además, surge que fue Ortega Vázquez quien le indicó primero a Cintrón Millán que su karaoke no servía, luego de que el segundo le mencionara que le había puesto la canción solicitada. Asimismo, del testimonio de Cintrón Millán se desprende que este evitó la confrontación en todo momento, incluso le dijo a Ortega Vázquez que dejaran el problema ahí. En consecuencia, el segundo señalamiento de error tampoco se cometió.

Por otro lado, en su quinto señalamiento de error, la parte apelante plantea que subsistió la duda razonable de que Ortega Vázquez actuara "a propósito" o "con conocimiento" de causarle la muerte a Helmis Cintrón, cuando este último no estuvo envuelto en la discusión entre Cintrón Millán y Ortega Vázquez, y ni siquiera se encontraba en el lugar cuando ocurrió la misma. En esencia, argumenta que de la prueba se infiere que el disparo que Ortega Vázquez le realizó a Helmis Cintrón se produjo en medio de un encuentro repentino, luego de que el primero saliera en busca de Cintrón Millán.

Conforme al derecho antes expuesto, se comete asesinato en primer grado cuando se le da muerte a una persona "a propósito" o "con conocimiento". En particular, una persona actúa "a propósito" cuando su objetivo consciente es la producción de dicho resultado, mientras que actúa "con conocimiento" cuando está consciente de que la producción del resultado es una consecuencia prácticamente segura de su conducta.

En el caso de autos, la parte apelante propone que Cintrón Millán y Ortega Vázquez sostuvieron una discusión previa al momento en que este último le diera muerte a Helmis Cintrón. De

hecho, la parte apelante también reconoce que el disparo de parte de Ortega Vázquez a Helmis Cintrón se produjo por un encuentro repentino, luego de que el primero saliera en busca de Cintrón Millán, quien se encontraba escondido. Por tanto, el elemento mental de "a propósito" o "con conocimiento" del delito de asesinato en primer grado se transfirió de Cintrón Millán a Helmis Cintrón.

El testimonio de Cintrón Millán estableció que, en el momento en que Ortega Vázquez entró al negocio, sacó el arma de fuego cuando vio a Cintrón Millán salir del baño. Según surge de la transcripción de la prueba oral, Cintrón Millán señaló que salió corriendo del negocio y escuchó un tiro, por lo que se escondió detrás de un vehículo de motor y pudo ver a Ortega Vázquez salir del negocio.[195] Añadió, además, que cuando salió del negocio y logró subir la cuesta, vio que Ortega Vázquez se le había ido detrás.

Por otro lado, se desprende del testimonio de Cintrón Cruz que Ortega Vázquez le disparó a Helmis Cintrón dos disparos a quemarropa.[196] Esto, sin mediar palabras. También señaló que Ortega Vázquez le disparó en el rostro cuando le cuestionó sobre el acto contra su hijo, Helmis Cintrón.[197] Igualmente, del testimonio de Cintrón Cruz surge que este observó cuando Ortega Vázquez entró al negocio y le disparó en varias ocasiones a su hijo, Cintrón Millán.[198] Asimismo, Rivera Nieves testificó que observó a Ortega Vázquez bajar de la grúa, entrar al negocio apuntando con un arma de fuego y escuchó varias detonaciones. A su vez, Rivera Nieves declaró que, posteriormente, fue herida de bala por el apelante, sin mediar palabra.[199] De otro lado, surge del testimonio de Morales Figueroa que Ortega Vázquez disparó contra ella y su esposo,

---

[195] TPO, págs. 24-25.
[196] Íd., pág. 92.
[197] Íd.
[198] Íd., págs. 91-92.
[199] Íd., págs. 125-126.

hiriéndola de bala.[200] Incluso, se desprende de su testimonio que Ortega Vázquez le continuó disparando luego de que ella le increpara por el acto de dispararle. Además, el agente Vázquez López ocupó once (11) casquillos en el lugar de los hechos, corroborando así los testimonios sobre los múltiples disparos efectuados por Ortega Vázquez.[201]

No cabe duda de que los hechos perpetrados por Ortega Vázquez contra las víctimas de este caso revelan que este actuó a propósito y con conocimiento, configurándose así los elementos del delito de asesinato en primer grado, tipificado en el Artículo 93 de Código Penal de 2012, *supra.* Es decir, la acción de dispararle en varias ocasiones a las víctimas, sin mediar palabra, y el ocasionarle la muerte a Helmis Cintrón con dos disparos a quemarropa, evidencian más allá de duda razonable el elemento mental requerido por dicho artículo. Por tanto, es forzoso concluir que Ortega Vázquez le dio muerte a Helmis Cintrón a propósito y con conocimiento. Por consiguiente, el quinto error señalado no se cometió.

Como cuarto señalamiento de error, la parte apelante plantea que la prueba no estableció más allá de duda razonable que Ortega Vázquez le haya disparado a Rivera Espinell, por lo que no se configuraron los delitos estatuidos en el Artículo 5.15 de la Ley de Armas de 2000, *supra,* así como el de tentativa de asesinato.

En el caso de autos, el Ministerio Público, descansó en el testimonio de la esposa de Rivera Espinell para probar que Ortega Vázquez le disparó e intentó asesinar a Rivera Espinell. Según argumenta la parte apelante, durante el interrogatorio directo de Morales Figueroa, esta testificó que Ortega Vázquez disparaba hacia ellos, es decir, hacia ella y su esposo. Sin embargo, la parte apelante arguye que, durante el contrainterrogatorio, Morales Figueroa

---

[200] TPO, págs. 190-191.
[201] Íd., pág. 187.

admitió que prestó una declaración jurada al día siguiente de los hechos, en donde afirmó que vio a Ortega Vázquez disparar hacia su casa y no hacia ellos. Por tanto, la parte apelante plantea que las acusaciones por apuntar y disparar, así como la tentativa de asesinato, contra Morales Figueroa se sostienen, toda vez que resultó herida de bala por Ortega Vázquez. Ahora bien, alega que las acusaciones por disparar y apuntar, así como la tentativa de asesinato contra Rivera Espinell no se sostienen en la prueba desfilada en el juicio.

Si bien es cierto que la testigo Morales Figueroa admitió que en su declaración jurada había mencionado que Ortega Vázquez disparaba a la casa y no hacia su esposo y ella, durante el juicio también declaró que este disparaba hacia ellos. En específico, Morales Figueroa declaró lo siguiente durante el directo:

| | |
|---|---|
| F. RODRÍGUEZ: | Ok. Y usted le indicó al tribunal que vio a Alberto Ortega disparando. **¿Para dónde vio a Alberto que estaba disparando, usted?** |
| T. MORALES: | Hacia nosotros. |
| DEFENSA: | Repetitivo, Juez. Ya ha contestado. |
| JUEZ: | Se va a permitir. |
| DEFENSA: | ¿Ah? |
| JUEZ: | Se va a permitir. Adelante. |
| F. RODRÍGUEZ: | ¿Hacia dónde? |
| T. MORALES: | **Hacia nosotros**. |
| F. RODRÍGUEZ: | Cuando usted dice nosotros ¿a quién usted se refiere? |
| T. MORALES: | **A mi esposo y a mí.** |
| F. RODRÍGUEZ: | Ok. ¿Qué hace una vez usted ve a Alberto Ortega disparando hacia usted? |
| T. MORALES: | Mi esposo se levanta primero, pero que yo seguí en el momento en el *shock* de quedármele mirando y como confrontarle. Antes de entrar, |

mi esposo me dijo "entra que nos está disparando". (Énfasis nuestro).[202]

De lo declarado, se desprende que Morales Figueroa testificó en juicio que Ortega Vázquez disparaba hacia su esposo y ella. En cuanto a su esposo, esta declaró que él le dijo "entra que nos está disparando". No surge de la transcripción de la prueba oral que dicha aseveración haya sido objetada por la defensa de Ortega Vázquez. Cabe aclarar que, contrario a lo propuesto por la parte apelante, no era necesario que Rivera Espinell resultara herido para que se tipifique el delito de tentativa de asesinato, pues de la prueba creída por el jurado se desprende que hubo actos inequívocos dirigidos a cometer el delito de asesinato. En específico, las actuaciones desplegadas por Ortega Vázquez al disparar con un arma de fuego hacia donde se encontraba Figueroa Morales y Rivera Espinell, nos lleva a determinar que la tentativa de asesinato, así como los delitos estatuidos en el Artículo 5.15 de la Ley de Armas de 2000, *supra*, se probaron más allá de duda razonable,

De igual forma, los miembros del jurado le dieron entera credibilidad al testimonio de Morales Figueroa y rindieron un veredicto unánime de culpabilidad contra Ortega Vázquez por los cargos de tentativa de asesinato, así como el de apuntar y disparar contra Rivera Espinell. Cabe destacar que los miembros del jurado deliberaron luego de que la Jueza de instancia les impartiera la instrucción sobre la credibilidad de los testigos y la instrucción sobre probar la culpabilidad del acusado más allá de duda razonable. Además, estos recibieron las instrucciones sobre tentativa de asesinato y sobre apuntar y disparar, según tipificado en el Artículo 5.15 de la Ley de Armas de 2000, *supra*. De este modo, la deliberación y veredicto del jurado están revestidos de una presunción de regularidad. De un examen sosegado de la

---

[202] TPO, pág. 191, líneas 1-15.

transcripción de la prueba oral, así como de los autos originales, no encontramos fundamentos sobre prejuicio, parcialidad o pasión que nos mueva a resolver lo contrario.

Por último, en el tercer señalamiento de error, la parte apelante plantea que procede revocar las sentencias por el Artículo 5.15 de la Ley de Armas de 2000, *supra*, toda vez que estas fueron absorbidas por un delito de mayor alcance (asesinato en primer grado) tipificado en el Artículo 93 del Código Penal de 2012, *supra*.

Conforme expusiéramos, el Artículo 9 (b) del Código Penal de 2012, *supra*, dispone que la disposición de mayor alcance de protección al bien jurídico absorberá la de menor amplitud y se aplicará la primera. Por su parte, el Artículo 7.03 de la Ley de Armas de 2000, *supra*, establece que todas las penas de reclusión que se impongan bajo esta Ley serán cumplidas consecutivamente entre sí y consecutivamente con las impuestas bajo cualquier otra ley. De este modo, el Artículo 7.03 de la Ley de Armas de 2000, *supra*, representa una excepción al concurso establecida por la Asamblea Legislativa. No habiendo conflicto entre ambas disposiciones penales, y prohibido el concurso de delitos bajo la Ley de Armas de 2000, además de poder procesarse por ambas disposiciones, las convicciones de Ortega Vázquez obligan a imponer penas por ambas y de forma consecutiva. En conclusión, tampoco se cometió el tercer error señalado.

Estudiada cuidadosamente la transcripción de la prueba oral, examinados los autos originales, así como la prueba documental, y habiendo dado la debida consideración a los alegatos de las partes de epígrafe, procede confirmar los dictámenes apelados.

**IV**

Por los fundamentos que anteceden, confirmamos las *Sentencias* apeladas, en todos sus extremos.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones